[No. H019769. Sixth Dist. Apr. 14, 2000.]

THE PEOPLE, Petitioner,
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
PETER BAEZ, Real Party in Interest.

**COUNSEL**

George W. Kennedy, District Attorney, and Robert H. Baker, Deputy District Attorney, for Petitioner.

No appearance for Respondent.

Gerald Uelmen; Nolan & Armstrong, Thomas J. Nolan and Mara K. Goldman for Real Party in Interest.

**OPINION**

**MIHARA, J.**—Real party in interest Peter Baez was indicted on one count of grand theft and numerous marijuana counts. He sought discovery from the district attorney's office in support of his contention that the district attorney's pursuit of the grand theft count was an unconstitutionally discriminatory prosecution. The superior court granted Baez's discovery motion. Asserting that the superior court abused its discretion in granting Baez's motion, the People ask us to issue a peremptory writ of mandate directing the superior court to vacate its ruling. We find no abuse of discretion and deny the petition.

*Facts*

In May 1995, Baez began receiving housing assistance from the Santa Clara County Housing Authority (SCCHA). In his application for housing assistance, Baez stated that his only source of income was "SSI" (Supplemental Security Income from Social Security). Baez was eligible for housing assistance and SSI because he suffers from AIDS. SCCHA distributes funds provided by the United States Department of Housing and Urban Development (HUD). Baez's housing assistance was in the form of a check payable to his landlord. This check was for approximately $900 per month.

Recipients of housing assistance from SCCHA are required to notify SCCHA of any change in their income or assets. SCCHA also performs yearly recertifications which require recipients to complete and sign documents verifying their income and assets. In December 1996, as part of a yearly recertification, Baez affirmed that there were no changes in his income or assets other than an increase in his SSI benefits. Baez stated that he had no bank accounts. In February 1997, an SCCHA employee initiated an interim recertification regarding Baez's benefits after he saw a television program in which Baez was featured. Baez again verified that he had no income or assets other than his SSI benefits.

The Santa Clara County Medical Cannabis Center (SCCMCC) opened in March 1997. The purpose of SCCMCC was to "dispense marijuana to people who needed it for legitimate use." Baez was the executive director of SCCMCC, and he was responsible for all marijuana sales at the center. SCCMCC represented that it was a nonprofit organization staffed by individuals who were not paid salaries. In January 1998, as part of another yearly recertification by SCCHA, Baez again verified that his income and assets had not changed except for an increase in his SSI benefits. He again affirmed that he had no bank accounts. Baez continued to receive benefits from SCCHA.

In 1998, the district attorney's office initiated a police investigation of Baez based on allegations that SCCMCC was not properly verifying that its clients had physician recommendations for the use of marijuana. In March 1998, the police executed a search warrant at SCCMCC and seized all patient records and financial documents. The police also seized Baez's personal financial records and arrested Baez. Subsequently, the police contacted SCCHA and provided SCCHA with copies of these financial records and an analysis of these records prepared by the district attorney's office. Similar documents were provided to the Internal Revenue Service (IRS). SCCHA had not previously contacted the district attorney's office regarding Baez.[1]

These financial records disclosed that SCCMCC had issued checks for what appeared to be Baez's personal expenses, and cash deposits had been made into Baez's personal bank account. SCCHA used these records to determine whether Baez had been eligible for the housing assistance he had received. It determined that Baez had become ineligible for housing assistance in October 1996 and had continued to be ineligible thereafter. An SCCHA employee concluded that Baez had "misrepresented his income and assets totally."[2] Nevertheless, as of May 1998, Baez was continuing to receive housing assistance from SCCHA.

### Procedural Background

In May 1998, Baez was indicted on six marijuana counts and one count of grand theft of HUD funds. Baez sought discovery in support of his claim that the district attorney's prosecution of him was "vindictive and selective

---

[1]SCCHA has a "kind of a special agreement set up" with the district attorney's office whereby SCCHA "work[s] with the District Attorney's Office in prosecuting fraud cases through our County Counsel . . . ."

[2]The record does not expressly reflect that SCCHA or any of its employees determined that Baez had intentionally misrepresented his income and assets.

prosecution" based on his status as executive director of SCCMCC. His motion specified in detail precisely the evidence which he wished disclosed.[3]

Baez initially supported his discovery motion with declarations from his attorney and his attorney's research assistant and "the records and files in this action."[4] The full text of these two declarations is set forth in the margin. His attorney asserted that "[s]ubstantially similar allegedly fraudulent claims have been disposed of without prosecution in other cases" and that "[t]he criminal prosecution in this case appears to be motivated by the desire of an officer of the San Jose Police Department to discredit and demonize the defendant in the eyes of the public."[5] His attorney's research

---

[3]He requested the following: (1) "information pertaining to discussions or memorandum concerning the charging of the Defendant"; (2) "information contained in discussions or memorandum concerning the charging of the Defendant"; (3) "instances of similar Housing Authority violations that were brought to the attention of the District Attorney's office and were not prosecuted, within the last sixty months"; (4) "instances of similar Housing Authority violations that were brought to the attention of the District Attorney's office and were criminally prosecuted as misdemeanors, within the last sixty months"; (5) "instances of similar Housing Authority violations which were brought to the attention of the District Attorney's office and were criminally prosecuted as felonies, within the last sixty months"; (6) "policies of the District Attorney's office regarding or concerning prosecution of any Housing Authority violations"; (7) "all complaints made to the District Attorney's office regarding alleged Housing Authority violations within the last sixty months"; and (8) "formal or informal agreements or understandings between or among the San Jose Police Department, the Santa Clara County District Attorney's Office, and the Santa Clara County Housing Authority with regard to the investigation and/or prosecution of recipients of housing benefits or subsidies."

[4]These records include transcripts of testimony before the grand jury.

[5]This declaration read, in full: "I Gerald F. Uelmen, declare that: [¶] 1. I am co-counsel for the defendant, PETER BAEZ, in this action. [¶] 2. On information and belief, there is good cause to require production of the information sought by this motion (and listed in Exhibit A, which is attached to this motion) for the following reasons: [¶] The defendant was charged in Count Seven with grand theft for failure to report alleged income to the Santa Clara County Housing Authority and thereafter receiving housing subsidies under circumstances in which the ordinary procedure of internal review of allegedly fraudulent claims was not pursued. Substantially similar allegedly fraudulent claims have been disposed of without criminal prosecution in other cases. The criminal prosecution in this case appears to be motivated by the desire of an officer of the San Jose Police Department to discredit and demonize the defendant in the eyes of the public. This officer initiated the complaint to the Housing Authority, and this same officer requested the federal Internal Revenue Service to undertake an audit of the defendant's income taxes. [¶] 3. On information and belief, the Santa Clara County District Attorney's Office, the San Jose Police Department, and the Santa Clara County Housing Authority have possession or control of the information requested in this motion, and this information is inaccessible to the defendant. [¶] 4. The evidence sought to be discovered is material to defendant's defense of vindictive and discriminatory prosecution. [¶] I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct."

assistant, David Stein, declared that he had interviewed the SCCHA employee who had interacted with Baez.[6] Stein had been informed that SCCHA

---

[6]This declaration read, in full: "I David N. Stein, declare that: [¶] 1. I am a law student at Santa Clara University School of law, and a research assistant for Professor Gerald F. Uelmen, co-counsel for defendant Peter Baez. [¶] 2. At Professor Uelmen's request, I interviewed Mr. Nick [Chhlotu], a housing program analyst with the Santa Clara County Housing Authority, on August 26, 1998. [¶] 3. The purpose of my interview was to ascertain the policy of the Housing Authority with respect to initiating criminal prosecution against recipients of housing subsidies. [¶] 4. Mr. [Chhlotu] informed me that mistakes and oversights generally do not lead to termination of assistance. Under normal circumstances, when a recipient does not properly fill out a form due to a misunderstanding of what constitutes an 'asset' or 'income', the Housing Authority does not terminate a recipient's funding. Generally, the Housing Authority will determine the amount that the recipient should have received, and have the recipient pay back any funds that they were not entitled to. If the Housing Authority recognizes that there was no purposeful attempt to defraud them, generally, the recipient's assistance is not terminated and he/she continues to receive their benefits at the newly adjusted rate. [¶] 5. Mr. [Chhlotu] also informed me that the definition of 'income' and 'assets' depends on the source of the money/asset, on the regularity of the money/asset, and on the specific circumstances surrounding the money/asset. He used the term 'any regular source of funds or gifts' to define income, and he further stated that the Housing Authority, not the recipient, gets to determine what items or funds fit into that definition. [¶] 6. Mr. [Chhlotu] advised me that the Housing Authority does not investigate a recipient when they receive an anonymous tip. However, if a witness is willing to write out their accusation and give their name, the Housing Authority will institute an investigation. This investigation begins with a recertification hearing, in order to determine if the participant will admit to any material change in circumstances. If the recipient admits there is a material change of circumstance, the Housing Authority makes the proper adjustments to the recipient's package and determines if any monies are owed to the Housing Authority. Only if the Housing Authority has cause to believe that the recipient was less than forth coming, will they institute an investigation. Because the Housing Authority does not conduct its own outside investigations, they give the relevant information to law enforcement officials and allow them to conduct the investigation. [¶] 7. Mr. [Chhlotu] gave me specific examples of behavior that would be flagrant or egregious enough to invite criminal prosecution. His examples involved behavior that could not be construed as either a mistake or misunderstanding. He gave several examples that might lead the Housing Authority to communicate with the District Attorney's office and request a participant be criminally prosecuted. Mr. [Chhlotu]'s first example was of a woman with two children that purposefully hid the fact that her husband was residing with her. Moreover, her husband would be gainfully employed and his income would purposefully be hidden from the Housing Authority. He made it clear that this would not be a case of either mistake or oversight. Without a doubt the wom[an] knew that her husband was both living with her and gainfully employed. In his example the woman would be actively and purposefully hiding these facts from the Housing Authority. His next example was of a woman with two children, who hid the fact that her rental, which the Housing Authority was subsidizing, was owned by her husband. Again, this would be a purposeful attempt to hide information from the Housing Authority. Mr. [Chhlotu] made it clear that the woman certainly knew who [her] landlord was, and she certainly knew that he was her husband. Again, he stated that this behavior could not be construed as either an oversight or mistake. The final example involved a person working under the table. In this scenario a person would be claiming that they were unemployed, while working for an employer under the table on a regular basis. The money received by the employee could not be construed, under any circumstances, to be anything other than 'income'. Again, Mr. [Chhlotu] reiterated the fact that this example involves a

does not terminate benefits if the recipient has simply made a mistake or an oversight in reporting income and assets. Stein was also told that only "a purposeful attempt by a recipient to hide material information from the Housing Authority" would merit criminal prosecution.

Baez subsequently submitted two additional affidavits in support of his motion. The full text of these declarations is also set forth in the margin. One was the declaration of John Doherty, the director of AIDS Legal Services in Santa Clara County.[7] Doherty stated that he was "personally acquainted with at least three clients who were recipients of subsidized housing benefits through the SCCHA, and whose eligibility for those benefits was questioned because of failure to comply with requirements that would affect their eligibility for housing benefits." He stated that in each of those cases, "the dispute was resolved by means of administrative proceedings," and that he was unaware "of any individual afflicted with [AIDS] who has been prosecuted in the criminal courts for fraud in not reporting income to the

purposeful attempt by a recipient to hide material information [from] the Housing Authority. [¶] I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct."

[7] This declaration read, in full: "I, JOHN DOHERTY, declare: [¶] 1. I am an attorney licensed to practice in all California courts and have been a member of the California Bar since February, 1996. [¶] 2. I am the director of AIDS Legal Services, a program sponsored by the Santa Clara County Bar Law Foundation to assist clients afflicted with AIDS with their legal problems. In the course of my duties as director of the program, I work closely with many attorneys who accept referrals to assist our clients, and frequently counsel and assist clients with their housing and health problems. [¶] 3. I served as the housing attorney of this program for three years, since February, 1996. During that period I have been personally acquainted with at least three clients who were recipients of subsidized housing benefits through the Santa Clara County Housing Authority, and whose eligibility for those benefits was questioned because of failure to comply with requirement that would affect their eligibility for housing benefits. In every case that I am aware of, the dispute was resolved by means of administrative proceedings. I am not aware of any individual afflicted with [AIDS] who has been prosecuted in the criminal courts for fraud in not reporting income to the Housing Authority. [¶] [4.] I have spoken with seven attorneys who regularly assist clients who are the recipients of subsidized housing benefits through the Housing Authority of Santa Clara County, and represent or assist these clients in legal proceedings regarding their eligibility for benefits. Collectively, these attorneys were aware of at least eight cases in which clients were accused of failure to comply with requirements that would affect their eligibility for housing benefits, including two cases in which clients were accused of underreporting their income. None of these cases resulted in criminal prosecution. None of these attorneys were aware of any case in which an AIDS victim was criminally prosecuted for failure to report income to the Housing Authority. [¶] I am personally acquainted with Peter Baez, and aware of the factual circumstances which resulted in his indictment for grand theft for failure to report income to the Housing Authority. Based upon my experience in assisting other clients who were accused of substantially similar conduct, I believe that similarly situated individuals could have been prosecuted, but were not. In my opinion, Peter Baez was unfairly singled out for prosecution for this offense because of his visibility as the director of the Santa Clara County Medical Cannabis Center. [¶] I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on January 27, 1999 at San Jose, California."

Housing Authority." Doherty also stated that he had "spoken with seven attorneys who regularly assist clients who are recipients of subsidized housing benefits through the Housing Authority of Santa Clara County," and that "these attorneys were aware of at least eight cases in which clients were accused of failure to comply with requirements that would affect their eligibility for housing benefits, including two cases in which clients were accused of underrepresenting their income. None of these cases resulted in criminal prosecution."

The second additional declaration was by Thomas Ehrlich, a staff attorney at the Legal Aid Society of Santa Clara County. Ehrlich declared that he had "represented between 10 and 15 recipients of subsidized housing benefits who were accused of underreporting their income which allegedly made them ineligible for the benefits." He stated that none of those people had been criminally prosecuted; rather, their cases "were handled administratively through the Housing Authority, where the recipients were either found not to have underreported their income or if income was underreported, a payment plan was agreed to . . . ." Ehrlich recalled one particular client who had been subjected to an "administrative hearing at the Housing Authority," had been found to have accepted $8,139 in housing assistance to which she was not entitled and whose housing assistance was terminated. She was not prosecuted by the district attorney.[8]

---

[8] This declaration read, in full: "I, THOMAS EHRLICH, declare: [¶] 1. I am an attorney licensed to practice law in all California courts and have been a member of the California Bar since July, 1989. [¶] 2. From approximately January, 1991 through November, 1995, I was a staff attorney at Legal Aid Society of Santa Clara County in San Jose, California and was part of the Housing Unit. I represented low income tenants in unlawful detainer actions as well as recipients of subsidized housing benefits mainly through the Housing Authority of Santa Clara County in administrative meetings and hearings with the Housing Authority of Santa Clara County. [¶] 3. During that time I was employed by Legal Aid Society, I estimate that I represented between 10 and 15 recipients of subsidized housing benefits who were accused of underreporting their income which allegedly made them ineligible for the benefits. I do not recall any of these cases being referred to the District Attorney's office for criminal prosecution and I am certain that none of my clients were in fact criminally prosecuted by the District Attorney. All these cases were handled administratively through the Housing Authority, where the recipients were either found not to have underreported their income or if income was underreported, a payment plan was agreed to where the recipient would make monthly payments toward paying off the benefits to which they were not entitled. In the cases I handled, most of the recipients were allowed to continue on the subsidized housing program as long as they kept up their payments of their regular rent plus the payments to pay off the benefits to which they were not entitled. I can only recall the name of one of my clients who I represented in a Housing Authority administrative hearing. This client's name was Donna Westergard. Ms. Westergard was a client of mine while I worked at [L]egal Aid Society, but I represented her at an administrative hearing at the Housing Authority in November, 1996, after I left Legal Aid Society and was in private practice. Ms. Westergard was not allowed to continue on the subsidized housing program and it was determined that she owed the Housing

In opposing Baez's discovery motion, the People submitted no affidavits and simply relied upon excerpts from the transcript of the grand jury proceedings. The trial court concluded that Baez had borne his burden of producing "some evidence" of discriminatory prosecution under the standard set forth by the United States Supreme Court in *United States v. Armstrong* (1996) 517 U.S. 456 [116 S.Ct. 1480, 134 L.Ed.2d 687] and granted his discovery motion. The court stayed its order to permit the People to seek review. The People filed a petition in this court for a writ of mandate or prohibition and requested a stay pending our decision. We granted a stay and issued an alternative writ.

### Standard of Review

■ Baez challenges the People's assertion that the appropriate standard of review is abuse of discretion. He argues that a ruling which *grants* discovery is impervious to review unless the ruling entails a violation of a privilege or of a person's California constitutional right to be free of unlawful searches and seizures. Baez premises this contention solely on the California Supreme Court's decision in *Pacific Tel. & Tel. Co. v. Superior Court* (1970) 2 Cal.3d 161 [84 Cal.Rptr. 718, 465 P.2d 854] (hereafter *Pacific Tel.*). We reject Baez's contention and conclude that the applicable standard of review here is abuse of discretion.

Rulings on discovery motions have long been subjected to an abuse of discretion standard of review. (*People v. Ashmus* (1991) 54 Cal.3d 932 [2 Cal.Rptr.2d 112, 820 P.2d 214].) In *Ashmus*, the defendant in a (pre-Proposition 115) capital murder prosecution sought disclosure of the district attorney's charging practices. One of his purposes in seeking this material was to obtain support for his equal protection claim regarding death penalty prosecutions (i.e., discriminatory prosecution). The California Supreme Court held that the *trial* court "*could reasonably have concluded*" that the defendant had failed to satisfy the "plausible justification" standard which then governed the discoverability of such material. (*Ashmus*, at p. 980, italics added.) While the defendant's supporting evidence showed that the district attorney "treated different defendants differently," he provided no evidence that the district attorney's policies and practices "might be arbitrary and capricious or invidiously discriminatory." (*Ashmus*, at p. 980.) By concluding that the trial court's ruling must be upheld because the trial court could reasonably have concluded that the defendant failed to satisfy his burden, the California Supreme Court clearly applied an abuse of discretion standard of review to a ruling on a discovery motion in a criminal case.

Authority $8,319 in subsidized housing benefits to which she was not entitled. Ms. Westergard was never criminally prosecuted by the District Attorney's Office. [¶] I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on January 27, 1999 at San Jose, California."

Although Baez concedes that an abuse of discretion standard applies to review of an order *denying* discovery, he argues that an order *granting* discovery is not subject to the same standard of review. The sole support cited by Baez for this contention, *Pacific Tel.*, did not involve a discovery motion in a criminal case, and it did not apply, or authorize application of, a standard of review other than abuse of discretion to a trial court ruling granting a discovery motion. *Pacific Tel.* was a writ proceeding initiated after a trial court granted a discovery motion in a civil case. At the beginning of its opinion, the court initially considered "the *availability* of the prerogative writ sought by the defendants in this setting." (*Pacific Tel., supra,* 2 Cal.3d at p. 169, italics added.) The court expressed disapproval of the practice of appellate courts in allowing prerogative writs to be used as the "normal instruments for reviewing discovery orders." (*Ibid.*) In a footnote, the court pointed out that "the *use* of a prerogative writ" to contest the *granting* of discovery was not an appropriate *means* of contesting such an order on grounds other than a violation of a privilege or of a person's California constitutional right to be free of unlawful searches and seizures. (*Pacific Tel.,* at p. 170, fn. 11, italics added.) The court indicated that an appellate court should "refuse to entertain" writ petitions challenging discovery orders based on other grounds. (*Pacific Tel.,* at p. 170, fn. 11.) Nevertheless, even though the petitioner was seeking writ review to challenge an order granting discovery on other grounds, the California Supreme Court did not decline to consider the case on its merits and proceeded to review the trial court's decision to determine whether it had been an abuse of discretion. (*Pacific Tel.,* at pp. 170-171.) It held that the trial court "did not abuse its discretion" in granting the motion. (*Pacific Tel.,* at p. 165.)

*Pacific Tel.* does not indicate that the appropriate standard of review in this case is anything other than abuse of discretion. The footnote seized upon by Baez was not concerned with the standard of review but instead with when a prerogative writ should be *entertained* by an appellate court as an appropriate *means* for reviewing a grant of discovery in a *civil* case. While there was no statutory authorization for writ review of the order challenged in *Pacific Tel.*, Penal Code section 1511 expressly authorizes the People to seek review by a petition for writ of mandate or prohibition of an order *granting* a *criminal* defendant's motion for discovery. (Pen. Code, § 1511, subd. (a).) Because writ review is statutorily authorized here, *Pacific Tel.*'s dicta regarding the propriety of writ review when a civil discovery motion has been granted is irrelevant to the question of the appropriate standard of review to apply in the case before us.

*Pacific Tel.* did not purport to change the standard of review utilized by appellate courts in reviewing rulings *granting or denying* discovery motions.

The discovery motion in *Pacific Tel.* was, like the one before us, a *grant* of discovery, and the California Supreme Court actually applied an abuse of discretion standard of review in *Pacific Tel.* We are convinced that abuse of discretion is the appropriate standard of review which we should apply to a ruling granting a criminal defendant's discovery motion.

### *Murgia and Armstrong: How Heavy Is a Defendant's Burden?*

■  The parties dispute the nature of the burden that a criminal defendant must shoulder in order to obtain discovery in support of a discriminatory prosecution claim. The People claim that a criminal defendant must produce "some evidence" of discriminatory effect and discriminatory intent as described by the United States Supreme Court in *United States v. Armstrong, supra,* 517 U.S. 456. Baez maintains that a criminal defendant need only establish a "plausible justification" for his or her discovery request under the standards set forth by the California Supreme Court in *Murgia v. Municipal Court* (1975) 15 Cal.3d 286 [124 Cal.Rptr. 204, 540 P.2d 44] and *Griffin v. Municipal Court* (1977) 20 Cal.3d 300 [142 Cal.Rptr. 286, 571 P.2d 997]. We conclude that *Armstrong* sets forth the applicable burden.

*Murgia* held that a discriminatory prosecution claim was a valid defense to a criminal prosecution. *Murgia* involved several United Farm Workers (UFW) members who were being prosecuted for some minor criminal offenses. They sought discovery in support of their claim that their prosecution was part of a prosecutorial pattern of discriminatory prosecution of UFW members. They supported their discovery request with affidavits which demonstrated, among other things, that individuals who had violently assaulted UFW members in the presence of law enforcement officers had not been arrested or prosecuted, but the victims of those assaults had been arrested and abused by law enforcement officers. (*Murgia v. Municipal Court, supra,* 15 Cal.3d at pp. 291-292.) The trial court found that the defendants had established a prima facie case of discriminatory prosecution, but it refused to order discovery in support of this claim because it erroneously concluded that discriminatory prosecution was not a viable defense to a crime. (*Murgia,* at p. 293.)

The issue before the California Supreme Court was whether a discriminatory prosecution claim was a valid defense to a criminal prosecution. The court held that it was, and it concluded that the trial court had erred in denying the defendants' discovery request. The court based its analysis on "the established principle that in a criminal prosecution an accused is generally entitled to discover all relevant and material information in the possession of the prosecution that will assist him in the preparation and

presentation of his defense." (*Murgia v. Municipal Court, supra*, 15 Cal.3d at p. 293.) At that time, "criminal discovery in California [was] strictly a judicial creation." (*Griffin v. Municipal Court, supra*, 20 Cal.3d 300, 306.)[9] A criminal defendant could justify discovery by making a showing based on " 'general allegations which establish some cause for discovery other than "a mere desire for the benefit of all information which has been obtained by the People in their investigation of the crime." . . .' " (*Griffin*, at p. 306, citation omitted.) Such a discovery motion was required to " 'describe the requested information with at least some degree of specificity and must be sustained by *plausible justification.*' . . ." (*Griffin*, at p. 306, citation omitted and italics added.)

This "plausible justification" standard held sway in California until 1990. Penal Code section 1054, subdivision (e) took effect in 1990. This statute prohibits any discovery in a criminal case which is not expressly mandated by statute or required by the United States Constitution. (Pen. Code, § 1054, subd. (e); see also Pen. Code, § 1054.5, subd. (a).) There are no California statutes which expressly require the prosecution to disclose to the defense information which may support a discriminatory prosecution claim. (See Pen. Code, § 1054.1 [required disclosures to the defense].) Consequently, discovery of information pertinent to a discriminatory prosecution claim is no longer authorized in California unless such disclosure is required by the United States Constitution.

The scope of the United States Constitution's disclosure requirements was specifically addressed by the United States Supreme Court in *United States v. Armstrong, supra,* 517 U.S. 456. The precise issue was what showing a criminal defendant must make to warrant discovery in support of a discriminatory prosecution claim based on the United States Constitution's guarantee of equal protection. (*Armstrong*, at pp. 458, 461, 464 [116 S.Ct. at pp. 1484-1485, 1486].) The defendants in *Armstrong* were being federally prosecuted for distribution of crack cocaine. (*Armstrong*, at p. 458 [116 S.Ct. at p. 1483].) Their discovery motion in support of their discriminatory prosecution claim alleged that they had been "selected for federal prosecution because they are black." (*Armstrong*, at p. 459 [116 S.Ct. at p. 1483].) They initially offered but a single affidavit in support of their motion. This affidavit, by a paralegal employed by the federal public defender's office, alleged that every one of the 24 crack cocaine distribution prosecutions handled by that federal public defender's office since 1991 had involved a Black defendant. The affidavit was accompanied by a "study" of those 24 defendants and the status of their cases. (*Armstrong*, at p. 459 [116 S.Ct. at pp. 1483-1484].)

---

[9]Although *Griffin* was issued two years after *Murgia*, there had been no change in the basis or standards for discovery in the interim.

The prosecution opposed the defendants' discovery motion on the ground that the defendants had not produced any evidence that " 'the Government has acted unfairly or has prosecuted non-black defendants or failed to prosecute them.' " (*United States v. Armstrong, supra,* 517 U.S. at p. 459 [116 S.Ct. at p. 1484].) The trial court granted the discovery motion. The prosecution sought reconsideration and submitted affidavits by the individuals involved in the charging decisions disclaiming any discriminatory motivation. (*Armstrong,* at pp. 459-460 [116 S.Ct. at pp. 1483-1484].)

The defendants responded with two additional affidavits. One was a defense attorney's declaration that she had been told by a drug treatment center employee that there were equal numbers of White and non-White "users and dealers." This affidavit apparently was not specific as to what drug these "users and dealers" were using and dealing. (*United States v. Armstrong, supra,* 517 U.S. at p. 460 [116 S.Ct. at p. 1484].) The second affidavit was that of a criminal defense attorney who declared, apparently without elaboration, that "in his experience many nonblacks are prosecuted in state court for crack offenses." (*Armstrong* at p. 460 [116 S.Ct. at p. 1484].) The defendants also produced a newspaper article which reported that federal crack offenses were punished more severely than powder cocaine offenses and "almost every single one of them is black." (*Armstrong* at pp. 460-461 [116 S.Ct. at p. 1484].)

The trial court denied the prosecutor's request for reconsideration. (*United States v. Armstrong, supra,* 517 U.S. at p. 461 [116 S.Ct. at pp. 1484-1485].) The Court of Appeals upheld the trial court and ruled that " 'a defendant is not required to demonstrate that the government has failed to prosecute others who are similarly situated.' " (*Armstrong,* at p. 461 [116 S.Ct. at pp. 1484-1485].)

On review, at the outset the United States Supreme Court noted that there was a "background presumption" that "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." (*United States v. Armstrong, supra,* 517 U.S. at pp. 463-464 [116 S.Ct. at pp. 1485-1486].) In order to succeed on an actual discriminatory prosecution claim, a defendant "must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.' " (*Armstrong,* at p. 465 [116 S.Ct. at p. 1487].) "The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim." (*Armstrong,* at p. 468 [116 S.Ct. at p. 1488].)

The United States Supreme Court accepted the rule that the courts of appeals were applying which " 'require[s] some evidence tending to show

the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent. . . ." (*United States v. Armstrong, supra*, 517 U.S. at p. 468 [116 S.Ct. at p. 1488], citation omitted.) The court considered the question of "what evidence constitutes 'some evidence tending to show the existence' of the discriminatory effect element." (*United States v. Armstrong, supra*, 517 U.S. at p. 469 [116 S.Ct. at p. 1488].) The court rejected the court of appeals' conclusion that "a defendant may establish a colorable basis for discriminatory effect without evidence that the Government has failed to prosecute others who are similarly situated to the defendant." (*Armstrong*, at p. 469 [116 S.Ct. at p. 1488].) Instead, it held that a defendant must "produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not . . . ." (*Armstrong*, at p. 469 [116 S.Ct. at p. 1488].) The court declined to consider "the question [of] whether a defendant must satisfy the similarly situated requirement in a case 'involving direct admissions by [prosecutors] of discriminatory purpose.' " (*Armstrong*, at p. 469, fn. 3 [116 S.Ct. at p. 1488].)

"We think the required threshold—a credible showing of different treatment of similarly situated persons—adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." (*United States v. Armstrong, supra*, 517 U.S. at p. 470 [116 S.Ct. at p. 1489].) The court found the defendants' showing insufficient. The "study" did not show that *any non*-Blacks "could have been prosecuted for the offenses for which respondents were charged, but were not .so prosecuted." (*Armstrong*, at p. 470 [116 S.Ct. at p. 1489].) The "newspaper article" was irrelevant to the discriminatory prosecution claim. The affidavits merely "recounted hearsay and reported personal conclusions based on anecdotal evidence." (*Armstrong*, at p. 470 [116 S.Ct. at p. 1489].) The court concluded that the defendants had failed to produce evidence that "the Government declined to prosecute similarly situated suspects of other races." (*Armstrong*, at p. 458 [116 S.Ct. at p. 1483].) Since the defendants had not made an adequate showing, the United States Supreme Court held that the trial court had erred in ordering discovery. (*Armstrong*, at p. 470 [116 S.Ct. at p. 1489].)

In sum, although the burden on a California criminal defendant prior to 1990 did not require that he or she produce "some evidence" in support of his or her discriminatory prosecution claim in order to justify discovery in support of that claim, the enactment of Penal Code section 1054, subdivision (e) in 1990 subjected California criminal defendants to the burden necessary to justify disclosure under the United States Constitution. That burden is the one set forth in *Armstrong*. Baez was entitled to discovery only if the trial court concluded that he had produced "some evidence" in support of his

discriminatory prosecution claim. The trial court determined that he had met this burden. The only remaining question is whether the trial court's decision was an abuse of discretion.

## The Trial Court Did Not Abuse Its Discretion

■ The trial court here did not abuse its discretion in ordering discovery because the trial court "could reasonably have concluded" that Baez satisfied his burden of producing "some evidence" and making a "credible showing" of "different treatment of similarly situated persons." (*United States v. Armstrong, supra,* 517 U.S. at p. 470 [116 S.Ct. at p. 1489]; *People v. Ashmus,* 54 Cal.3d at p. 980.)

The strongest support for Baez's discovery motion came from the declarations of Doherty and Ehrlich. These attorneys submitted declarations that they had had numerous clients who had been accused by SCCHA of misrepresenting their income or assets in order to obtain housing assistance, but none of these individuals had been prosecuted for this conduct. Doherty declared that he had represented three clients afflicted with AIDS who had been accused by SCCHA of being ineligible to obtain housing assistance. None of these individuals were prosecuted for any alleged misrepresentations. Instead, SCCHA resolved these accusations through administrative proceedings. Doherty also declared that he was aware of the allegations against Baez and that these allegations were substantially similar to the allegations against his clients who had not been prosecuted.

Ehrlich declared that he had personally "represented between 10 and 15 recipients of subsidized housing benefits who were accused of underreporting their income which allegedly made them ineligible for the benefits." Ehrlich stated that none of these individuals were prosecuted for their alleged misrepresentations. Instead, these cases were handled administratively by SCCHA. One of his clients had been the subject of an administrative hearing at SCCHA, and her housing benefits had been terminated after it was determined that she had obtained $8,319 in benefits to which she was not entitled. She was not prosecuted by the district attorney's office.

These affidavits contained some evidence of discriminatory effect in that similarly situated individuals had not been prosecuted. Some evidence of discriminatory intent could be found in the district attorney's office's distribution of Baez's personal financial records to SCCHA and the IRS.[10] A reasonable inference could be drawn that the district attorney's office had

---

[10] Our dissenting colleague emphasizes that the police were "entitled to further investigate" and "provide[]" this evidence to other agencies. (Dis. opn., *post,* at p. 1201.) We *do not*

singled out Baez for prosecution for financial improprieties in order to buttress the marijuana counts with inflammatory evidence of a profit motive. Such a motivation could provide a foundation for a finding of discriminatory intent.

The People make several contentions in support of their argument that Baez failed to satisfy his burden of producing some evidence of discriminatory effect and discriminatory intent.[11] First, they assert that Baez failed to show that he was similarly situated to any of the individuals referred to in the Ehrlich and Doherty declarations. The People argue that those individuals were not prosecutable because their "mistakes in reporting their income" were "due to mistake or misunderstanding" rather than an "intent to defraud." The People assert that Baez was distinct from these individuals because there was strong evidence that he "did harbor the intent to defraud." We find no merit in this assertion. The declarations of Ehrlich and Doherty established that numerous individuals had been alleged to have obtained housing assistance by misrepresenting their income or assets. Doherty's declaration displayed familiarity with the allegations against Baez and Doherty's clients and declared that all of these allegations were "substantially similar." These declarations supported Baez's contention that these other individuals were similarly situated to him. Further, when evidence is presented that an individual has misrepresented his or her income or assets in order to obtain housing assistance, one of the reasonable inferences which may be drawn from this evidence is that the misrepresentation was *intentional*. The trial court, in exercising its discretion, was entitled to draw such an inference, and we presume that it did. We lack the power to select a contrary inference. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564, 566 [86 Cal.Rptr. 65, 468 P.2d 193].) Such an inference would support the trial court's conclusion that Baez had produced some evidence that these individuals, who were not prosecuted, had been accused of sufficiently similar conduct.

Second, the People claim that the declarations submitted by Baez were "incompetent" and "indistinguishable from the exhibits rejected by the

---

suggest otherwise. We merely acknowledge that a reasonable inference could be drawn, based on the evidence adduced by Baez, that the actions of the district attorney in this case were indicative of a discriminatory intent.

[11]The People made similar contentions below. They argued that Baez's supporting declarations were incompetent, that the individuals mentioned in the Doherty and Ehrlich declarations were dissimilar because they might have merely made mistakes in reporting their income and could not have committed fraud because, if they had, they would have been "referred to the D.A. for prosecution."

Supreme Court in *Armstrong*."[12] It is true that some portions of the declarations presented by Baez contained hearsay. However, the nonhearsay portions of these declarations contained sufficient evidence to support the trial court's ruling. The declarations of Ehrlich and Doherty about their *own* clients were not hearsay. These attorneys affirmed that they had personal knowledge of the facts of the cases they had *personally handled.* If the hearsay portions of these declarations are disregarded entirely, the declarations still contain some evidence that similarly situated clients of Doherty and Ehrlich were not prosecuted·for alleged conduct which was substantially similar to the alleged conduct of Baez.

Baez's showing is readily distinguishable from the inadequate showing rejected by the United States Supreme Court in *Armstrong*. The declarations of Doherty and Ehrlich are much different from the affidavits presented in *Armstrong*. The discovery motion in *Armstrong* was directed toward showing that similarly situated *non*-Blacks had not been federally prosecuted for crack offenses. The supporting affidavits omitted any evidence that *non*-Blacks had *not been* federally prosecuted for crack offenses. One affidavit merely stated that there had been 24 federal prosecutions of Blacks. A second affidavit recounted hearsay regarding the proportion of Black and non-Black *drug users and dealers* without specification of the drug involved. A third affidavit stated, without elaboration or other evidence of personal knowledge, an attorney's belief that many non-Blacks were prosecuted in state court for crack offenses. A study and a newspaper article were also submitted, but neither dealt with the absence of prosecution of non-Blacks. (*United States v. Armstrong, supra*, 517 U.S. at pp. 460-461 [116 S.Ct. at pp. 1484-1485].)

*Armstrong* reasonably concluded that the defendants therein had not produced even some evidence that similarly situated non-Blacks were not being federally prosecuted for crack offenses. None of the competent nonhearsay evidence produced by the defendants in *Armstrong* addressed this critical point. In contrast, Baez submitted evidence that numerous similarly situated individuals who were not purveyors of medical marijuana had been accused of, but had not been prosecuted for, misrepresentations to SCCHA. Unlike the evidence in *Armstrong*, which was primarily hearsay and unsupported unelaborated speculation, the primary evidence which supported Baez's motion was specific and based on the personal knowledge of Ehrlich and Doherty.

Third, the People maintain that the declarations were insufficiently detailed to permit the trial court to determine whether these other individuals

---

[12]Our dissenting colleague makes this same assertion when she argues that the affidavits submitted in *Armstrong* were "similar" to those submitted by Baez. (Dis. opn., *post*, at p. 1204.)

were sufficiently similar to Baez to support his claim. If the declarations of Ehrlich and Doherty were entirely devoid of detail, the People might have a point. However, both Ehrlich and Doherty provided adequate detail to enable the trial court to conclude that their clients had been similarly situated to Baez. Ehrlich averred that his clients had been accused of misrepresenting their income or assets to SCCHA in order to obtain housing assistance, and Doherty made a similar declaration. Doherty also provided the detail that his clients were, like Baez, afflicted with AIDS. He verified his familiarity with the facts of Baez's case and affirmed that the accusations against Baez were substantially similar to those that had been made against his clients. Ehrlich described one client's case with more than adequate detail including the precise amount of money involved and the final resolution of the matter. We do not believe that the trial court abused its discretion in concluding that Baez's evidence contained enough to detail to support a finding that there was some evidence of discriminatory effect.

Fourth, the People argue that Baez was "not prejudiced" by being selected for prosecution by the district attorney because SCCHA would inevitably have initiated an investigation of Baez once it discovered that his misrepresentations had been "intentional." There is no evidence in the record before us that SCCHA would inevitably have initiated an investigation of Baez without the intervention of the district attorney's office. Until the district attorney's office intervened and provided Baez's financial records to SCCHA, SCCHA had launched no investigation of Baez. In fact, even months after Baez's arrest, Baez was continuing to receive housing assistance from SCCHA. Hence, this no-prejudice argument is without a factual foundation.

Finally, the People contend that Baez produced no evidence of discriminatory intent. They assert that discriminatory purpose cannot be inferred unless there was evidence that the district attorney's office was *aware of* the *other* individuals and *their* misrepresentations. We disagree. The People concede that the prosecution of Baez for grand theft based on his alleged misrepresentations to SCCHA was initiated because of the district attorney's office's awareness of Baez's medical marijuana activity at SCCMCC. The district attorney's office initially targeted Baez for prosecution for allegedly failing to verify physician recommendations for marijuana. The district attorney's office proceeded to distribute Baez's personal financial records to SCCHA and the IRS. One of the possible inferences that the trial court could have drawn from the district attorney's office's distribution of Baez's financial records to SCCHA and the IRS is that the district attorney's office had singled out Baez for prosecution for financial improprieties in order to

buttress the marijuana counts with inflammatory evidence of a profit motive. Such a motivation might provide a foundation for a finding of discriminatory intent.

The People also reason that Baez did not make an adequate showing of discriminatory intent because SCCHA's decisionmaking regarding referrals to the district attorney's office is not attributable to the district attorney's office. However, Baez was *not* referred to the district attorney's office by SCCHA. Since SCCHA and the district attorney's office were partners in an arrangement whereby they jointly participated in the prosecution of fraud cases, SCCHA's *failure* to bring Baez to the attention of the district attorney's office supports an inference that it had no preexisting basis for pursuing a prosecution of Baez prior to the district attorney's office's intervention. Similarly, SCCHA apparently did not bring any of individuals mentioned in the Doherty and Ehrlich declarations to the attention of the district attorney's office.

Moreover, the record does not reflect that SCCHA made any relevant decision in this case. It did *not decide* to refer Baez to the district attorney's office for prosecution. It was the district attorney's office that brought Baez to SCCHA's attention. Baez demonstrated that SCCHA ordinarily will only contact the district attorney's office and seek an investigation or criminal prosecution if an internal SCCHA investigation, beginning with a recertification hearing, reveals that "the recipient was less than forth coming [*sic*]." Why and when SCCHA *might* refer someone to the district attorney's office for prosecution or investigation is irrelevant here, since there is no evidence that SCCHA referred Baez to the district attorney's office for prosecution or investigation.

Our dissenting colleague concludes that Baez failed to produce some evidence in support of his motion because the individuals described in the Ehrlich and Doherty affidavits were not similarly situated to Baez. In her view, there were "distinguishable legitimate prosecutorial factors" which justified the prosecution of Baez and nonprosecution of these otherwise similarly situated individuals. (Dis. opn., *post*, at p. 1205.) Her analysis of these "factors" disregards the applicable standard of review and repeatedly draws inferences which the trial court implicitly rejected.

The evidence in the record before us supports reasonable inferences other than the ones drawn by our colleague. Thus, we must respect the trial court's implied findings regarding these inferences rather than making our own findings and conclusions. Our colleague makes her own findings and conclusions and repeatedly rejects inferences favorable to Baez's showing and

makes inferences disfavorable to Baez.[13] Under the standard of review that we must apply in this case, all inferences must be drawn in favor of the trial court's ruling. Hence, we must draw all reasonable inferences in favor of Baez and refrain from drawing our own contrary inferences.

The trial court could reasonably have concluded, based on the evidence presented by Baez and the reasonable inferences arising therefrom, that Baez had presented "some evidence" and made a "credible showing" that (1) similarly situated persons could have been, but were not, prosecuted and (2) the district attorney's office had targeted Baez because of his involvement in the provision of medical marijuana.

### Conclusion

The trial court did not abuse its discretion in concluding that Baez had produced "some evidence" and made a "credible showing" in support of his discriminatory prosecution claim which was sufficient to merit discovery. The petition is denied.

Wunderlich, J., concurred.

**BAMATTRE-MANOUKIAN, Acting P. J.**—I respectfully dissent. I agree with my colleagues that the appropriate standard of review is abuse of discretion. (*People v. Ashmus* (1991) 54 Cal.3d 932 [2 Cal.Rptr.2d 112, 820 P.2d 214].) However, I would conclude that the trial court abused its discretion by ordering discovery in this case because Peter Baez failed to meet the "rigorous" standard set forth in *United States v. Armstrong* (1996) 517 U.S. 456, 468 [116 S.Ct. 1480, 1488, 134 L.Ed.2d 687] (*Armstrong*). In my opinion, Baez failed to produce " 'some evidence tending to show the existence of the essential elements of the defense' " (*ibid.*) of discriminatory prosecution: that his prosecution for grand theft was " 'motivated by a discriminatory purpose' " (*id.* at p. 465 [116 S.Ct. at p. 1487]), and that the decision to prosecute him resulted in a discriminatory effect, in that similarly situated persons who were not involved with medical marijuana distribution "could have been prosecuted" for grand theft, but were not (*id.* at p. 469 [116 S.Ct. at p. 1488]).

### Pertinent Facts

Baez, who suffers from AIDS, began receiving housing assistance through the Santa Clara County Housing Authority (SCCHA) in May of 1995. In his

---

[13]For instance, she infers that Baez made "flagrant" and "egregious" intentional misrepresentations, but she assumes that none of the similarly situated individuals made intentional or "flagrant" misrepresentations. (Dis. opn., *post*, at p. 1205.)

original application and during a December 1996 recertification, Baez asserted that his only source of income was his SSI (Supplemental Security Income) benefits and that he had no checking or savings account. During a February 1997 recertification, Baez reiterated those assertions, and he specifically denied receiving any income from the Santa Clara County Medical Cannabis Center (SCCMCC), of which he was a executive director. During a January 1998 recertification, Baez again stated that he had no income other than his SSI benefits, and that he had no checking or savings account.

In fact, as revealed by a March 1998 police investigation, Baez *was* receiving income from the SCCMCC. He was also using SCCMCC funds to pay for his personal expenses, including his housing and medical expenses, and his water, cable, and garbage services. In addition, Baez had two personal bank accounts. Finally, he had recently purchased a vehicle for $9,600 and he had withdrawn money in order to go on a pleasure cruise.

The March 1998 police investigation was initiated when the police received information that the SCCMCC was providing marijuana to persons without legitimate doctors' recommendations. (See Health & Saf. Code, § 11362.5). Police executed a search warrant at the SCCMCC and examined files and other business records, including the SCCMCC's check ledgers.

While examining the check ledgers, San Jose Police Sergeant Scott Savage noticed "[a] number of [Baez's] personal expenses drawn on the business account." Sergeant Savage believed Baez's use of SCCMCC funds to pay for his personal expenses indicated embezzlement or tax fraud. He began to examine Baez's personal financial records, thereby discovering the bank accounts.

The information discovered by Sergeant Savage was provided to the SCCHA. The SCCHA determined that Baez would not have been eligible for the housing benefits paid on his behalf between October 1996 and April 1998, which amounted to $14,611. A SCCHA analyst, Nicholas Chhlotu, opined that the evidence demonstrated that Baez had "misrepresented his income and assets totally."

Following the police investigation, the district attorney sought a grand jury indictment of Baez. The indictment charged Baez with five counts of selling marijuana (Health & Saf. Code, § 11360, subd. (a)), one count of maintaining a place for the sale or use of marijuana (Health & Saf. Code, § 11366), and one count of grand theft of money from the United States Department of Housing and Urban Development (Pen. Code, §§ 484, 487, subd. (a)).

*Standard for Discovery*

As the majority opinion explains, Proposition 115, approved by the voters in 1990, abrogated traditional principles of criminal discovery in favor of a statutory scheme. (Pen. Code, § 1054, subd. (e); *In re Littlefield* (1993) 5 Cal.4th 122, 129 [19 Cal.Rptr.2d 248, 851 P.2d 42].) Now, discovery is permitted in criminal cases only where authorized by statute "or as mandated by the Constitution of the United States." (Pen. Code, § 1054, subd. (e); see *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 378 [285 Cal.Rptr. 231, 815 P.2d 304].)

No statute provides for discovery of material relevant to a claim of selective or discriminatory prosecution. However, in *Armstrong, supra,* 517 U.S. 456, the United States Supreme Court held that the federal Constitution requires that a criminal defendant be permitted to discover such material, as long as he or she first produces " 'some evidence tending to show the existence of the essential elements of the defense.' " (*Id.* at p. 468 [116 S.Ct. at p. 1488].) "The claimant must demonstrate that the . . . prosecutorial policy [1] 'had a discriminatory effect *and* [2] that it was motivated by a discriminatory purpose.' [Citations.]" (*Armstrong, supra,* 517 U.S. at p. 465 [116 S.Ct. at p. 1187], italics added.)

*Armstrong* made it clear that a defendant seeking discovery to support a claim of selective prosecution has a high burden. The court explained that "[t]he justifications for a rigorous standard for the elements of a selective-prosecution claim . . . require a correspondingly rigorous standard for discovery in aid of such a claim." (*Id.* at p. 468 [116 S.Ct. at p. 1488].) It further stated that "the showing necessary to obtain discovery should . . . be a significant barrier to the litigation of insubstantial claims." (*Id.* at p. 464 [116 S.Ct. at p. 1486].)

*Baez's Showing*

Baez's discovery motion was supported by four declarations. David Stein's declaration recounted the SCCHA's policies about referring individuals for prosecution by the district attorney and about referring individuals for investigation by law enforcement. The SCCHA will refer an individual for prosecution only if his or her conduct was "flagrant or egregious." The SCCHA will refer an individual for investigation by law enforcement only when he or she was "less than forthcoming" at a recertification hearing. By contrast, if the individual admitted to a "material change in circumstances," there is no referral for investigation by law enforcement. Stein's declaration did not allege that other individuals committed grand theft from the SCCHA but were not prosecuted.

Gerald F. Uelmen's declaration alleged: "The criminal prosecution in this case appears to be motivated by the desire of an officer of the San Jose Police Department to discredit and demonize the defendant in the eyes of the public. This officer initiated the complaint to the Housing Authority, and this same officer requested the federal Internal Revenue Service to undertake an audit of the defendant's income taxes." Uelmen's declaration further asserted that "[s]ubstantially similar allegedly fraudulent claims have been disposed of without criminal prosecution in other cases." This statement was not supported by any factual references.

John Doherty's declaration asserted that "[b]ased upon my experience in assisting other clients who were accused of substantially similar conduct, I believe that similarly situated individuals could have been prosecuted, but were not." He explained that he knew of "at least three clients who were recipients of subsidized housing benefits through the [SCCHA], and whose eligibility for those benefits was questioned because of failure to comply with requirements that would affect their eligibility for housing benefits." He stated that each of his clients' cases "was resolved by means of administrative proceedings." Doherty did not specify facts concerning the "requirements" his clients had failed to comply with, whether the clients were in fact found to be in noncompliance, or the amount of benefits involved in each case.

Doherty also asserted that he was told, by other attorneys, of "at least eight cases in which clients were accused of failure to comply with requirements that would affect their eligibility for housing benefits, including two cases in which clients were accused of underrepresenting their income," none of which resulted in criminal prosecution.

Thomas Erlich's declaration described recipients of housing assistance who had been "accused of underreporting their income." Some of the individuals had been "found not to have underreported their income." Others were found to have underreported their income, but had agreed to "pay[] off the benefits to which they were not entitled." None of those individuals had been referred to the district attorney for prosecution, nor actually prosecuted. Erlich identified one particular client who was found to owe the SCCHA $8,319 in benefits; she was terminated from the subsidized housing program but not criminally prosecuted.

*Did Baez Meet the Armstrong Standard?*

As discussed above, in order to obtain discovery under *Armstrong*, Baez was required to produce " 'some evidence tending to show the existence of

the essential elements of the defense,' discriminatory effect and discriminatory intent." (*Armstrong, supra,* 517 U.S. at p. 468 [116 S.Ct. at p. 1488].) I would conclude that defendant did not produce some evidence tending to show the existence of either element.

*Discriminatory Intent*

I would conclude that Baez failed to produce "some evidence" tending to show discriminatory intent, because he failed to demonstrate that his prosecution for grand theft was " 'motivated by a discriminatory purpose.' " (*Armstrong, supra,* 517 U.S. at pp. 465, 468 [116 S.Ct. at p. 1487].)

" ' "Discriminatory purpose" . . . implies more than . . . intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.'. . ." (*Wayte v. United States* (1985) 470 U.S. 598, 610 [105 S.Ct. 1524, 1532, 84 L.Ed.2d 547], citation omitted.) "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." (*Arlington Heights v. Metropolitan Housing Corp.* (1977) 429 U.S. 252, 266 [97 S.Ct. 555, 564, 50 L.Ed.2d 450] (*Arlington Heights*).)

The "specific sequence of events leading up to the challenged decision" is a factor to be examined in determining whether a prosecution was motivated by a discriminatory purpose. (*Arlington Heights, supra,* 429 U.S. at p. 267 [97 S.Ct. at p. 564].) Here, the police received information that Baez was engaged in illegal marijuana sales at the SCCMCC. They obtained a search warrant and examined the SCCMCC's business records, including its check ledgers. In the course of that investigation, the police discovered SCCMCC checks written to Baez and checks written for Baez's personal expenses. This evidence led the police to suspect Baez of some financial impropriety such as tax evasion or embezzlement. Therefore, they further investigated his financial records to determine if he was in fact committing such offenses. In the course of that investigation, they provided the financial information to the SCCHA as well as to the IRS. When Sergeant Savage was asked if he "routinely do[es] that in every case," he replied, "I've done that in several cases prior to this, and I assume I'd do that afterwards. I would assume I wasn't following through, if I didn't do that."

It is undisputed that the evidence leading to the charge of grand theft was discovered during the investigation into the allegations of illegal marijuana sales. The SCCHA was unaware that Baez was receiving income from

the SCCMCC or that he had two personal bank accounts until after the police investigation revealed those facts and reported the information to the SCCHA.

The majority conclude that distribution of Baez's personal financial records to the SCCHA and the IRS constituted "some evidence" tending to show discriminatory purpose. (*Armstrong, supra,* 517 U.S. at p. 468 [116 S.Ct. at p. 1488].)They reason: "One of the possible inferences that the trial court could have drawn from the district attorney's office's distribution of Baez's financial records to SCCHA and the IRS is that the district attorney's office had singled out Baez for prosecution for financial improprieties in order to buttress the marijuana counts with inflammatory evidence of a profit motive. Such a motivation might provide a foundation for a finding of discriminatory intent." (Maj. opn., *ante,* at pp. 1194-1195.) I disagree.

I believe that the police were entitled to further investigate when, during the course of their investigation into the alleged marijuana offenses, they discovered evidence that Baez was engaged in financial improprieties. The fact that the police and the district attorney provided the financial information to government agencies does not indicate that they were intentionally singling out Baez for prosecution in order to buttress the marijuana counts. Once the police discovered evidence indicating that Baez was committing additional offenses, the prosecuting authorities were entitled to provide that evidence to the appropriate agencies for a determination of whether Baez had in fact committed such offenses. The police were not required to ignore that evidence or cease their investigation of crimes other than the illegal marijuana sales. Baez provides no authority for the proposition that the police or prosecution may not follow up on evidence discovered during an investigation or prosecution of other crimes.

When the SCCHA was provided with the financial information discovered during the police investigation, they determined that Baez had "misrepresented his income and assets totally" and that he had received $14,611 in benefits to which he was not entitled. The record before us indicates that defendant's improper conduct was the prosecution's "motivation" for charging him with grand theft. I find no evidence in the record from which the trial court could infer that defendant's prosecution for grand theft was " 'motivated by a discriminatory purpose.' " (*Armstrong, supra,* 517 U.S. at p. 465 [116 S.Ct. at p. 1187].)

I would conclude that Baez failed to produce "some evidence" tending to show that his prosecution for grand theft was " 'motivated by a discriminatory purpose.' " (*Armstrong, supra,* 517 U.S. at pp. 465, 468, 470 [116 S.Ct.

1480, 1487-1488].) For that reason, I would conclude that he did not meet the discovery standard set forth in *Armstrong,* which requires "some evidence" of *both* discriminatory intent and discriminatory effect. (*Id.* at p. 468 [116 S.Ct. at p. 1488].)

Because *Armstrong* requires "some evidence" of *both* discriminatory intent and discriminatory effect, Baez's failure to produce "some evidence" of discriminatory intent was, in my opinion, fatal to his discovery motion. (*Armstrong, supra,* 517 U.S. at p. 468 [116 S.Ct. at p. 1488].) However, I write further to explain why I also disagree with the portion of the majority opinion that holds defendant produced "some evidence" tending to show discriminatory effect. (*Ibid.*)

### *Discriminatory Effect*

I would also conclude that Baez failed to produce " 'some evidence tending to show the existence' of the discriminatory effect element." (*Armstrong, supra,* 517 U.S. at p. 469 [116 S.Ct. at p. 1488].) He did not "produce some evidence that similarly situated defendants" who were not involved with medical marijuana distribution "could have been prosecuted [for grand theft from SCCHA], but were not, . . ." (*Ibid.*)

In *U.S. v. Olvis* (4th Cir. 1996) 97 F.3d 739 (*Olvis*), the court examined the discriminatory-effect prong of the *Armstrong* test. After a police investigation of a large crack cocaine conspiracy, 25 Blacks were indicted on federal charges. There were 55 other people involved in the conspiracy, including five non-Blacks, who were not indicted. The defendants sought discovery of the government's prosecution criteria, alleging that at least three Whites had been granted immunity despite the fact that they were at least as culpable as the defendants, and that at least two Whites had not been charged. The government responded to the discovery motion, explaining that some of the Whites had agreed to help the prosecution, while there was insufficient evidence to indict the others. "Focusing only on the evidence of the conspirators' criminal activity, the [district] court found all to have 'similar involvement' in the conspiracy" and granted the defendants' discovery motion. (*Id.* at p. 744.) On appeal, the court of appeals reversed, explaining that "the district court in this case failed to take into account several factors that play important and legitimate roles in prosecutorial decisions. [Citation.]" (*Ibid.*)

The court further explained: "Generally, in determining whether persons are similarly situated for equal protection purposes, a court must examine all relevant factors. . . . 'The goal of identifying a similarly situated class of law breakers is to isolate the factor allegedly subject to impermissible discrimination. . . . If all other things are equal, the prosecution of only

those persons [to whom the factor applies] . . . gives rise to an inference of discrimination. But where the comparison group has less in common with defendant, then [other] factors . . . may very well play a part in the prosecution.' . . . [¶] . . . Prosecutorial decisions may . . . be legitimately influenced by such factors as the strength of the evidence against a particular defendant, the defendant's role in the crime, . . . , the defendant's candor and willingness to plead guilty, the amount of resources required to convict a defendant, the extent of prosecutorial resources, the potential impact of a prosecution on related investigations and prosecutions, and prosecutorial priorities for addressing specific types of illegal conduct. [¶] Making decisions based on the myriad of potentially relevant factors and their permutations require the very professional judgment that is conferred upon and expected from prosecutors in discharging their responsibilities. . . . [D]efendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." (*Olvis, supra,* 97 F.3d at p. 744; see also *U.S. v. Magana* (1st Cir. 1997) 127 F.3d 1, 8.)

In *People v. McPeters* (1992) 2 Cal.4th 1148 [9 Cal.Rptr.2d 834, 832 P.2d 146], decided before *Armstrong*, the defendant sought discovery to support his claim that the district attorney was selectively seeking the death penalty or life without parole sentences against homicide defendants whose victims were White. He submitted in support of his discovery motion a study listing homicide victims, indicating their race and whether or not a death penalty or a life without parole sentence had been imposed. The study showed that all death or life without parole sentences were meted out in cases involving White victims, although only one-third of all willful homicide victims in the county were White. As the court explained, this did not provide a basis for the requested discovery: "The study did not describe or analyze the facts or circumstances of any case, other than the sentence and the race of [the] victim. For example, it did not attempt to distinguish between single and multiple homicide cases, nor did it attempt to account for nonracial factors that could have explained differences in charging and sentencing." (*Id.* at p. 1170)

Clearly, in order for a trial court to examine "all relevant factors" and determine whether "distinguishable legitimate prosecutorial factors" justify a decision to prosecute one individual but not others, it must have before it sufficient facts about the other individuals and their conduct. (*Olvis, supra,* 97 F.3d at p. 744.)

Here, neither the Stein declaration nor the Uelmen declaration contains *any* facts about any individuals who were not involved with medical marijuana distribution and could have been prosecuted for grand theft from SCCHA, but were not.

Doherty's declaration was also insufficient. He identified "at least three clients" whose eligibility for housing benefits was "questioned because of failure to comply with requirements that would affect their eligibility for housing benefits." He did not specify the particular "requirements" that the clients had failed to comply with. Thus, the trial court could not have determined whether those individuals' conduct was similar to defendant's conduct, in that they had underreported income and assets or received a significant amount of benefits to which they were not entitled.

Doherty also described cases he had learned about through other attorneys, "in which clients were accused of failure to comply with requirements that would affect their eligibility for housing benefits, including two cases in which clients were accused of underrepresenting their income." He alleged his belief, based upon his "experience," that "similarly situated individuals could have been prosecuted, but were not."

In *Armstrong*, the defendants submitted similar affidavits in support of their discovery motion, which alleged that they were being federally prosecuted for crack cocaine offenses because they were Black. One affidavit, from a defense attorney, alleged "that an intake coordinator at a drug treatment center had told her that there are 'an equal number of [C]aucasian users and dealers to minority users and dealers.' " (*Armstrong, supra,* 517 U.S. at p. 460 [116 S.Ct. at p. 1484].) Another affidavit was from a criminal defense attorney who alleged "that in his experience many nonblacks are prosecuted in state court for crack offenses." (*Ibid.*) The court concluded that these affidavits did not constitute "some evidence" of discriminatory effect: "Respondents' affidavits . . . recounted hearsay and reported personal conclusions based on anecdotal evidence." (*Id.* at p. 470 [116 S.Ct. at p. 1489].)

As *Armstrong* makes clear, a bare allegation that similarly situated individuals were not prosecuted, without supporting facts, does not provide "some evidence" tending to show discriminatory effect. (*Armstrong, supra,* 517 U.S. at p. 468 [116 S.Ct. at p. 1488].) *Armstrong* also makes clear that a declaration based on hearsay is insufficient to meet the standard for discovery. Doherty's declaration suffers from both of these defects and it therefore did not provide sufficient evidentiary support for defendant's discovery motion.

The Erlich declaration identifies individuals who, like defendant, had been "accused of underreporting their income." Only some of those individuals were found to have actually underreported their income, and each of them had agreed to "pay[] off the benefits to which they were not entitled." None of the individuals had been referred to the district attorney for prosecution and none of the individuals had been prosecuted. One individual was found to owe the SCCHA $8,319 in benefits; she was terminated from the subsidized housing program but not criminally prosecuted.

The Erlich declaration does contain some facts from which the trial court could have determined whether or not "distinguishable legitimate prosecutorial factors" justified defendant's prosecution for grand theft. It specifies the nature of the conduct (underreporting income) and, in one case, the amount of benefits improperly received ($8,319). However, based on the information contained in this declaration and the Stein declaration, I would find that there *are* legitimate prosecutorial factors that distinguish defendant's case from the individuals identified in the Erlich declaration. These factors indicate that the individuals identified in the Erlich declaration are not similarly situated to defendant.

First, the police discovered evidence of Baez's alleged grand theft during an independent investigation into allegations of illegal marijuana sales. It does not appear that any of the individuals identified in the Erlich declaration were being investigated for other offenses at the time their misrepresentations were discovered. Rather, their misrepresentations were discovered during SCCHA administrative proceedings, and the SCCHA was able to resolve those cases without referring them to law enforcement for investigation or to the district attorney for prosecution. Thus, they were not similarly situated to Baez. The district attorney could reasonably and legitimately decide to use its prosecutorial resources to prosecute Baez for grand theft of housing assistance funds because evidence of that offense was discovered during an independent investigation, and because that offense was related to the other substantive offenses.

Second, the evidence indicates that the individuals identified in the Erlich declaration who were found to have underreported income were forthcoming about their underreporting, and that their misrepresentations were not "flagrant or egregious," since none of them were referred for investigation or prosecution. According to the Stein declaration, if the SCCHA believes that a recipient was "less than forthcoming" during a recertification, it will refer that individual to law enforcement for investigation, and if the SCCHA believes that a recipient's misrepresentations were "flagrant or egregious," it will refer that individual for prosecution. Thus, the only reasonable inference that can be drawn from the evidence is that the individuals who were found to have underreported their income were forthcoming and did not make flagrant or egregious misrepresentations, since each case was resolved without a referral for investigation or prosecution.[14]

The evidence did not show that Baez was similarly situated to the individuals identified in the Erlich declaration who were found to have underreported their income. In contrast to those cases, here there was strong

---

[14]Of course, the SCCHA did not refer Baez for prosecution or investigation by law enforcement, either—because law enforcement initiated the investigation and discovered the evidence of his misrepresentations.

evidence that Baez *was* "less than forthcoming" about his income and assets and that his conduct *was* "flagrant or egregious." Baez was subject to an interim recertification during which he was *specifically questioned* about receiving income from the SCCMCC. At that time, and during a subsequent annual recertification, he failed to admit that he was receiving income from the SCCMCC, that he was using SCCMCC funds to pay for his personal expenses, that he had purchased a vehicle for $9,600, and that he had two personal bank accounts. Had he admitted these misrepresentations at one of the recertifications, the SCCHA might have followed the same procedures it used in the other cases: recalculated his eligibility and set up a payment plan.

The district attorney could legitimately choose to prosecute Baez, who failed to admit that he was underreporting income, and who had "misrepresented his income and assets totally." Defendant was not similarly situated to individuals who were "forthcoming," whose conduct was neither flagrant nor egregious, and who were never referred for investigation by law enforcement or prosecution by the district attorney. (See *U.S. v. Magana, supra*, 127 F.3d at pp. 8-9 [other individuals' prompt confessions and cooperation were "readily apparent nondiscriminatory reasons" justifying decision not to charge].)

In my opinion, defendant failed to produce "some evidence that similarly situated defendants" who were not involved with medical marijuana distribution "could have been prosecuted [for grand theft from the SCCHA], but were not." (*Armstrong, supra*, 517 U.S. at p. 469 [116 S.Ct. at p. 1488].)

*Conclusion*

Since Baez did not produce "some evidence" tending to show either discriminatory intent or discriminatory effect (*Armstrong, supra,* 517 U.S. at p. 468 [116 S.Ct. at p. 1488]), I would conclude that the trial court abused its discretion by granting Baez's motion for discovery. I would grant the district attorney's petition for a writ of mandate.

A petition for a rehearing was denied May 11, 2000. Bamattre-Manoukian, J., was of the opinion that the petition should be granted. Petitioner's application for review by the Supreme Court was denied August 9, 2000.