**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 11, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CURTIS BLACKWELL,

        Plaintiff - Appellee,

    v.

BEN STRAIN,

        Defendant - Appellant,

and

JOHN DENKO; FORREST SMITH;
TIM LABIER; DEPARTMENT OF
PUBLIC SAFETY, State of New
Mexico, ex rel. Motor Transportation
Division, and Taxation & Revenue
Department-Motor Vehicle Division,

        Defendants.

No. 11-2078

D. New Mexico

(D.C. No. 2:09-CV-00377-MCA-WPL)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **HOLLOWAY**, and **GORSUCH**, Circuit Judges.

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.    Introduction

Curtis Blackwell, a commercial truck driver, claimed he was stopped, detained, subjected to a heightened inspection level, and issued a citation at the Lordsburg, New Mexico, Port of Entry ("POE") because he is black. Blackwell filed a civil-rights lawsuit against, *inter alia*, Ben Strain, the New Mexico Motor Transportation Division ("MTD") officer with whom he interacted at the POE. In his complaint, Blackwell alleged, among other things, a violation of his right to equal protection under the law. Officer Strain moved for summary judgment, asserting qualified immunity. After the district court denied his motion, Officer Strain appealed. The district court erred in denying summary judgment to Officer Strain because, under Blackwell's version of the facts that have record support, Officer Strain did not violate his right to equal protection under the law. Accordingly, exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **reverses** and **remands** to the district court with instructions to grant summary judgment to Officer Strain.

## II.   Background

New Mexico requires all commercial motor carriers to stop at designated ports of entry. As vehicles proceed through the POE, an MTD officer stationed at a POE window either directs the driver to proceed without an inspection or directs the driver into the POE parking lot for an inspection. MTD officers inspect

commercial vehicles and accompanying documentation to determine whether the vehicles, drivers, and cargo are in compliance with state law.

MTD officers perform three levels of inspections, with a Level I inspection being the most thorough. Level I inspections are not at issue in this case. Officers not scheduled to conduct Level I inspections exercise their discretion in selecting between Level II and Level III inspections. A Level II inspection allows an MTD officer to review a driver's documents, including the log book and drivers license, and conduct safety checks of the cab, trailer, equipment, and components. A Level III inspection is limited to a review of the driver's documents and cargo verification.

On August 15, 2008, Blackwell, who was driving a tractor-trailer on Interstate 10, entered the POE. When Blackwell pulled up to the POE window, Officer Strain directed him to pull his vehicle out of line and proceeded to conduct a Level II inspection. During the inspection, Officer Strain discovered an unopened bottle of gin and an unopened pack of beer in an outside storage compartment of the trailer. Possession of alcohol under these circumstances was a violation of New Mexico transportation regulations. As a penalty for the violation, Officer Strain ordered Blackwell to remove his tractor-trailer from service for twenty-four hours and assessed a $250 penalty.

Blackwell, who is black, claimed he was subjected to selective law enforcement because of his race and filed an equal-protection-based civil rights

lawsuit against Officer Strain. Officer Strain claimed Blackwell's race played no part in his decision to detain Blackwell, perform a Level II inspection, or issue Blackwell a citation. He asserted he was not yet aware of Blackwell's race when he decided to perform a Level II inspection on Blackwell's tractor-trailer. He also claimed the citation he issued Blackwell was mandatory. Officer Strain filed a motion for summary judgment claiming, among other things, he was entitled to qualified immunity because Blackwell had not shown a violation of a clearly established constitutional right.

In support of his claim, Blackwell presented evidence he asserts shows both discriminatory effect and discriminatory purpose on the part of Officer Strain. This evidence includes Blackwell's account of his experience at the POE, statistical evidence presented by an expert witness, statements provided by other black truck drivers who said they were discriminated against by MTD officers at the POE because of their race, and evidence that state and federal narcotics agents and individuals at the federal public defenders office believed racial profiling was occurring at the POE.

The district court denied Officer Strain's motion for summary judgment. The court concluded Blackwell came forward with evidence sufficient to create genuine issues of material fact as to racially discriminatory effect and racially discriminatory purpose. It also concluded Blackwell's right not to be subjected to racially selective law enforcement was clearly established on August 15, 2008.

Officer Strain appeals, arguing he is entitled to qualified immunity because, under Blackwell's version of the facts that have record support, he did not violate Blackwell's clearly established constitutional rights.

## III. Standard of Review

"Because this is an interlocutory appeal from a denial of summary judgment, our jurisdiction under 28 U.S.C. § 1291 is limited." *Bowling v. Rector*, 584 F.3d 956, 963 (10th Cir. 2009). The denial of a summary judgment motion is generally not an appealable final order under § 1291. *Id.* "Such a denial is subject to appeal, however, when the defendants are public officials asserting a qualified immunity defense and the appealed issue is whether a given set of facts establishes that defendants violated clearly established law." *Id.* (quotation omitted); *see also Johnson v. Jones*, 515 U.S. 304, 311 (1995); *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985).

Thus, this court may consider Officer Strain's appeal but "only insofar as it presents neat abstract issues of law." *Bowling*, 584 F.3d at 963 (quotation omitted). Officer Strain "may not appeal the district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a genuine issue of fact for trial." *Id.* (quotations and alteration omitted). Furthermore, "it is not our province to determine whether the record supports the district court's factual assumptions." *Id.* (quotation omitted). "[I]nstead, we

-5-

simply take, as given, the facts that the district court assumed when it denied summary judgment for a purely legal reason." *Id.* (quotations omitted).

This court reviews the district court's denial of a summary judgment motion asserting qualified immunity de novo, applying the same legal standard as the district court. *Id.* Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence is considered in the light most favorable to Blackwell, the non-moving party. *Bowling*, 584 F.3d at 964.

Summary judgment orders denying qualified immunity, however, are reviewed differently from other summary judgment decisions. *Id.* When a defendant asserts a qualified immunity defense, "the burden shifts to the plaintiff, who must meet a strict two-part test by showing (1) that the defendant violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant's conduct." *Id.* (quotations omitted). "We may, at our discretion, consider the two parts of this test in the sequence we deem best in light of the circumstances in the particular case at hand." *Id.* (quotation omitted).

## IV.  Analysis

A claim of racially selective law enforcement requires the plaintiff to "demonstrate that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose." *Marshall v. Columbia Lea Reg'l Hosp.*,

345 F.3d 1157, 1168 (10th Cir. 2003). "The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision." *Id.* To survive Officer Strain's motion for summary judgment, Blackwell must present evidence from which a jury could reasonably infer Officer Strain was motivated by a discriminatory purpose and his actions had a discriminatory effect. *Id.* Blackwell, of course, must also show his right to equal protection under the law was clearly established at the time of Officer Strain's conduct. This court concludes that, under Blackwell's version of the facts that have record support, Officer Strain did not violate his right to equal protection under the law. Blackwell failed to present evidence from which a jury could reasonably infer Officer Strain was motivated by a discriminatory purpose. Thus, Officer Strain is entitled to qualified immunity.

### A. Statistical Evidence

#### 1. Introduction

In its order denying summary judgment, the district court first set forth statistical evidence proffered by Blackwell in support of its conclusion a jury could reasonably infer Officer Strain was motivated by a discriminatory purpose and his actions had a discriminatory effect. Statistical evidence can be used to show both discriminatory effect and discriminatory purpose. *Marshall*, 345 F.3d at 1168 (noting that most selective law enforcement claims are "based on statistical comparisons between the number of black or other minority Americans

stopped or arrested and their percentage in some measure of the relevant population"). To be useful, however, a statistical comparison "requires a reliable measure of the demographics of the relevant population, a means of telling whether the data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population." *Id.* (citations omitted).

Statistical evidence alone is rarely enough to show discriminatory purpose. Although the Supreme Court "has accepted statistics as proof of intent to discriminate in certain limited contexts," only in "rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation." *McCleskey v. Kemp*, 481 U.S. 279, 293 & n.12 (1987); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action . . . . But such cases are rare." ). This is because, to prevail on an equal protection claim, a plaintiff "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey*, 481 U.S. at 292. Examples of "those rare cases in which a statistical pattern of discriminatory impact demonstrated a constitutional violation" include *Gomillion v. Lightfoot*, 364 U.S. 339, 340-41 (1960), and *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886). *McCleskey*, 481 U.S. at 293 n.12. In *Gomillion*, the Supreme Court held a state legislature violated the Fifteenth Amendment when it altered a city's boundaries

"from a square to an uncouth twenty-eight-sided figure," thereby excluding 395 of 400 black voters without excluding a single white voter. 364 U.S. at 340-41. The Court held that "the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration" that the state acted with a discriminatory purpose. *Id.* at 341. In *Yick Wo*, an ordinance required laundry operators to obtain a permit, and all but one of the white applicants received permits while none of the over 200 Chinese applicants received permits. 118 U.S. at 373-74. The Court determined that the statistical disparity "warrent[ed] and "require[d] the conclusion" the state acted with a discriminatory purpose. *Id.* "Absent a pattern as stark as that in Gomillion or Yick Wo," however, "impact alone is not determinative, and the Court must look to other evidence." *Vill. of Arlington Heights*, 429 U.S. at 266 (footnote omitted); *see also Chavez v. Ill. State Police*, 251 F.3d 612, 647-48 (7th Cir. 2001).[1]

---

[1]The Supreme Court has also accepted statistics as the sole evidence of discriminatory purpose in certain limited contexts, including "as proof of an equal protection violation in the selection of the jury venire in a particular district" and "in the form of multiple-regression analysis to prove statutory violations under Title VII of the Civil Rights Act of 1964." *McCleskey v. Kemp*, 481 U.S. 279, 293-94 (1987). There is also some indication the Supreme Court would accept statistics as the sole evidence of discriminatory purpose in the context of challenges to legislative redistricting. *See Chavez v. Ill. State Police*, 251 F.3d 612, 647 (7th Cir. 2001) (citing cases). None of these contexts are implicated here. *See id.* at 647-48.

## 2.     Statistical Evidence Proffered by Blackwell

The district court relied on three statistical data sets for its conclusion a jury could reasonably infer Officer Strain was motivated by a discriminatory purpose. The first data set is not relevant and the validity of the second data set is doubtful as is the reliability of the third. We need not, however, resolve the question whether the validity or reliability of the latter data sets is a matter we can review on an interlocutory appeal from a denial of qualified immunity. *See Bowling*, 584 F.3d at 963. Even assuming these statistical data sets are valid and reliable, they do not show a pattern of discrimination as stark as that in *Gomillion* or *Yick Wo*. Thus, standing alone, they are not evidence from which a jury could reasonably infer Officer Strain was motivated by a discriminatory purpose. Instead, this statistical evidence must be coupled with other evidence of discriminatory purpose. As explained more fully below, Blackwell has failed to proffer any such evidence. Thus, he has failed to meet his burden of showing a reasonable jury could infer Officer Strain was motivated by a discriminatory purpose in this case.

As to the first data set, the district court stated that Blackwell's expert witness, James Williams, Ph.D., was prepared to testify that: "law enforcement activities at the POE produce 'race[] based differentials in outcomes'"; his "data tends to show that vehicles operated by Black truckers are subjected to inspections or searches at a much higher rate than vehicles operated by non-Black

-10-

truckers"; his data "tends to show that when MTD personnel cannot tell the ethnicity of a driver prior to instigating law enforcement activity, the percentage of Black truckers subjected to enforcement activity closely corresponds to the percentage of Black truckers on the road"; there is "a significant disparity between the percentage of Black truckers reporting delays due to inspections and searches (51.7%) and the percentage of other truckers reporting delays (28.3%)"; and "30.6% of the arrests by Officer Strain at the POE are Blacks, even though Black truckers make up only 14.6% of the truckers passing through the POE." Most of this statistical evidence concerns the conduct of MTD personnel at the POE as a whole, rather than the conduct of Officer Strain individually. As such, it is not evidence from which a jury could reasonably infer Officer Strain was motivated by a discriminatory purpose. *See United States v. Coleman*, No. 11-2173, 2012 WL 1764224, at *1 (10th Cir. May 18, 2012) (unpublished) (concluding "it would be a gross misuse of statistical data to extrapolate about [a particular officer's conduct] merely from aggregate data that covers many other individuals"); *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1196-97 (10th Cir. 2006) (stating that to be reliable, statistical data must "relate to the proper population" and control for key variables).

Moreover, the statistical evidence that concerns Officer Strain individually does not demonstrate he was motivated by a discriminatory purpose. The evidence regarding arrests made by Officer Strain shows that, of those individuals

-11-

Officer Strain stops, detains, and subjects to a heightened inspection level, a high percentage he ultimately arrests are black, more than double the percentage of truck drivers passing through the POE who are black.  Absent additional information, however, this evidence proves nothing because there is no reliable measure of the demographics of the relevant population, no means of telling whether the data represent similarly situated individuals, and no point of comparison to the actual incidence of crime among different racial segments of the population.

In *United States v. Olvis*, 97 F.3d 739, 745 (4th Cir. 1996), in support of their selective prosecution claim, the plaintiffs proffered a study showing that over 90% of the federal crack cocaine trafficking prosecutions in the area involved black defendants.  The Fourth Circuit noted that the study provided "no statistical evidence on the number of blacks who were actually committing crack cocaine offenses or whether a greater percentage of whites could have been prosecuted for such crimes." *Id.*  "Without an appropriate basis for comparison," the court concluded, "raw data about the percentage of black crack cocaine defendants proves nothing.  Such statistics could have relevance only if it could be presumed that crack cocaine violations were committed proportionately by all races—a presumption the Supreme Court rejected in *Armstrong* as 'at war' with unchallenged statistics." *Id.* (quoting *United States v. Armstrong*, 517 U.S. 456,

469-70 (1996)).  Thus, the Fourth Circuit concluded the study was not evidence of

discriminatory effect or purpose.  *Id.*[2]

Like in *Olvis*, the statistical evidence regarding arrests by Officer Strain

lacks an appropriate basis for comparison.  For example, there is no statistical

evidence regarding whether a greater percentage of non-blacks passing through

the POE could have been arrested.  Indeed, the evidence regarding arrests made

by Officer Strain is only relevant if it can be presumed that arrestable offenses

were committed proportionately by all races—a presumption prohibited by

*Armstrong*.  In sum, the statistical evidence regarding arrests by Officer Strain,

without more, is not evidence from which a jury could reasonably infer Officer

Strain was motivated by a discriminatory purpose.

The district court also relied on a second set of statistics, one involving the

following comparison of Officer Strain's arrest data:

---

[2]*See also United States v. Armstrong*, 517 U.S. 456, 470 (1996) (concluding that a study which "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted," did not constitute "evidence tending to show the existence of the essential elements of a selective-prosecution claim") (quotation omitted)); *James v. Davis*, 257 F.3d 1173, 1179 (10th Cir. 2001) ("[A] defendant cannot satisfy the discriminatory effect prong by providing statistical evidence which simply shows that the challenged government action tends to affect one particular group.  Rather, the proffered statistics must address the critical issue of whether that particular group was treated differently than a similarly-situated group."); *Chavez*, 251 F.3d at 642-45 ("[W]ithout comparative racial information, plaintiffs can not prove that they were stopped, detained, or searched, when similarly situated whites were not.").

At the POE, Officer Strain arrests Blacks at a rate that is twice their representation in the population of truckers passing through the POE, whereas the percentage of Blacks arrested by Officer Strain as the result of patrolling (where, as Dr. Williams hypothesized, it [is] more difficult for Officer Strain to confirm the driver's ethnicity prior to initiating law enforcement activity) closely corresponds to the percentage of Black truckers in the population of truckers passing through the POE.

It is admittedly curious that a higher percentage of the individuals Officer Strain arrests at the POE are black than the percentage he arrests while on patrol. There are, however, at least two potential problems with the validity of this statistical comparison. First, Dr. Williams's hypothesis that it is more difficult for Officer Strain to determine the race or ethnicity of a driver while on patrol than at the POE appears to have been pure conjecture. In his deposition, Dr. Williams testified he formed this hypothesis after reading about another study which concluded it is more difficult for officers to determine the race of a driver at night than during the day. He offered no evidence to support his extension of this study to the evidence of this particular case. Second, the record indicates the arrest data, at least with respect to arrests made while on patrol, includes individuals who are not truck drivers. Thus, it appears we lack a reliable measure of the demographics of the relevant population, i.e., the percentage of *individuals*, as opposed to *truck drivers*, in the areas Officer Strain patrols who are black. *See Marshall*, 345 F.3d at 1168 (stating that a statistical comparison "requires a reliable measure of the demographics of the relevant population"); *Chavez*, 251

F.3d at 642-45 (concluding that without reliable comparison data, plaintiff's statistics did not show discriminatory effect); *Olvis*, 97 F.3d at 745 ("Without an appropriate basis for comparison, raw data about the percentage of black crack cocaine defendants proves nothing."). This comparison of the percentage of black *individuals* arrested by Officer Strain as the result of patrolling with the percentage of black *truckers* he arrested passing through the POE is inappropriate. Even assuming its validity, however, this statistical comparison does not show a stark pattern of discrimination similar to that in *Gomillion* or *Yick Wo*. That is, the statistics are not so compelling that the only explanation for the anomalies therein is intentional racial discrimination. Thus, standing alone, this statistical evidence is not evidence from which a jury could reasonably infer Officer Strain was motivated by a discriminatory purpose.

Lastly, the district court cited to statistical evidence regarding inspections conducted by Officer Strain at the POE:

> [O]n the date that Officer Strain encountered [Blackwell], Officer Strain inspected seven trucks. Three of the seven truckers (43%), well in excess of their representation (14.6%) in the population of truckers passing through the POE were Black, and *every one of* the Black truckers was subjected to a Level II inspection, which includes a safe loading check. The two truckers who were White were subjected to Level III inspections. Two of the truckers were Hispanic: one was subjected to a Level III inspection and one was subjected to a Level II inspection.

(citations omitted). This statistical evidence, although relevant, is based on seven inspections performed by Officer Strain on a single day and is, therefore, not

reliable. *See James v. Davis*, 257 F.3d 1173, 1180 (10th Cir. 2001) (stating that a

sample size may be "too small to provide reliable statistical results"); *Chavez*,

251 F.3d at 643 (noting that a sample size must be "sufficiently large to be

reliable"). Even assuming its reliability, however, it does not show a stark pattern

of discrimination like that in *Gomillion* or *Yick Wo*, and, therefore, cannot by

itself demonstrate discriminatory purpose.[3]

In sum, the three sets of statistical data proffered by Blackwell, standing

alone, are not evidence from which a jury could reasonably infer Officer Strain

was motivated by a discriminatory purpose. Thus, they must be coupled with

---

[3]Contrary to the dissent's assertions, this evidence is not similar to the
evidence proffered by the plaintiff in *Marshall v. Columbia Lea Regional
Hospital*, 345 F.3d 1157, 1168-71 (10th Cir. 2003). In *Marshall*, there was
"evidence that in more than thirty cases, [the officer] falsely charged arrestees
with possession of narcotics, seriously mishandled narcotics evidence," and "was
accused of planting evidence on arrestees, as well as using evidence to barter for
sexual favors." *Id.* at 1162, 1170-71. The plaintiff in *Marshall* alleged this
evidence established a "pattern of discrimination against blacks and Hispanics,
and a *modus operandi* similar to that in his case." *Id.* at 1170-71. In this case,
Blackwell failed to provide data regarding the racial composition of truckers
passing through the POE on August 15, 2008. This court is not at liberty to
assume the racial composition of truckers passing through the POE on a single
day mirrors the racial composition of truckers passing through the POE over a
period of several months. Without that data, this evidence does not establish a
pattern of discrimination against blacks or a *modus operandi* similar to that in this
case. In short, this evidence is not similar to the "evidence regarding extensive
alleged misconduct" by the officer in *Marshall*. *Id.* at 1170. Moreover, as the
dissent acknowledges, the plaintiff in *Marshall* also proffered "direct evidence"
of racially discriminatory purpose, which included, *inter alia*, evidence the officer
repeatedly accused the plaintiff of being on crack with no apparent basis, made
unnecessary note of the plaintiff's race, and changed his account of the events
dramatically. *Id.* at 1168, 1170. In contrast, Blackwell proffered no direct
evidence of racially discriminatory purpose in this case.

other evidence of discriminatory purpose if Blackwell is to meet his burden of showing a jury could reasonably infer Officer Strain was motivated by a discriminatory purpose. Because he failed to proffer any other evidence Officer Strain was motivated by a discriminatory purpose, Blackwell failed to meet his burden.

**B.  Other Evidence Proffered by Blackwell**

Contrary to Officer Strain's assertions, there need not be direct evidence of discriminatory purpose; discriminatory purpose can be shown with purely circumstantial evidence. *Vill. of Arlington Heights*, 429 U.S. at 266-68; *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006). In this case, the district court concluded "a reasonable juror could reason as follows based upon [Blackwell's] proffered evidence":

> Officer Strain is known for aggressively interdicting drugs. Safety inspections provide Officer Strain with an opportunity to search for drugs. In particular, Level I and Level II inspections provide Strain with an opportunity to search for illegal drug shipments in the guise of a safe cargo check. Notwithstanding his denial of racial profiling, Officer Strain has been proceeding on the assumption that Black truckers are more likely than White truckers to be involved in transporting illegal drugs. Accordingly, Officer Strain selects Black truckers as a group for inspections at a disproportionately higher rate than their representation in the general population of truckers, and the inspections to which he subjects Black truckers are more intrusive than the inspections to which White truckers are subjected.

(quotations and citation omitted).[4] The only one of these statements supported by the record is that "Officer Strain is known for aggressively interdicting drugs." The remaining statements appear to be inferences the district court concluded a jury could reasonably make based on Blackwell's proffered evidence, although it did not indicate what that evidence was. If indeed, based on Blackwell's proffered evidence, a jury could reasonably make these inferences, Blackwell has likely met his burden at the summary judgment stage of demonstrating Officer Strain was motivated by a discriminatory purpose. Officer Strain argues, however, that these inferences are not supported by any record evidence whatsoever, and, therefore, we need not credit them. He argues that because these factual conclusions entirely lack record support, we are permitted to review the entire record de novo to determine whether a jury could reasonably make these inferences based on Blackwell's proffered evidence. Blackwell argues the district court's inferences are supported by the record, but more importantly, that we lack jurisdiction to review them.

As a general rule, "it is not our province to determine whether the record supports the district court's factual assumptions." *Bowling*, 584 F.3d at 963

---

[4]The district court also reached the following conclusion: "From the foregoing proffered evidence, a reasonable juror could conclude that Officer Strain selects Black truckers for inspections at a disproportionately high rate, and that when Officer Strain has the discretion to determine the level of an inspection, he disproportionately subjects Black truckers to Level II inspections, which include a safe loading check." Because this factual conclusion is no different in substance from the factual conclusion quoted, we do not analyze it separately.

(quotation omitted). "[I]nstead, we simply take, as given, the facts that the district court assumed when it denied summary judgment for a purely legal reason." *Id.* (quotations omitted); *see also Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) ("[I]f a district court concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true—and do so even if our own *de novo* review of the record might suggest otherwise as a matter of law."). Where, however, "the 'version of events' the district court holds a reasonable jury could credit 'is blatantly contradicted by the record,' we may assess the case based on our own *de novo* view of which facts a reasonable jury could accept as true." *Lewis*, 604 F.3d at 1225-26 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

In this case, the inferences made by the district court are wholly devoid of record support. There is no record evidence, for example, supporting the inference that Officer Strain has assumed "Black truckers are more likely than White truckers to be involved in transporting illegal drugs." Aside from the statistical evidence proffered by Blackwell regarding inspections Officer Strain conducted on August 15, 2008, which is insufficient alone to support an inference of discriminatory purpose, there is no further record evidence supporting the inference that Officer Strain selects black truckers for inspections at a disproportionately higher rate than their representation in the general population of truckers or that the inspections to which he subjects black truckers are more

-19-

intrusive than those to which he subjects white truckers.  Because the record is devoid of any evidence that supports these inferences we need not and do not credit them.  *See Scott*, 550 U.S. at 380, 381 n.8 (noting that at the summary judgment stage, we draw "all inferences in favor of the nonmoving party *to the extent supportable by the record*" and refusing to adopt a version of facts "so utterly discredited by the record that no reasonable jury could have believed [it]"); *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) (stating that "we adopt plaintiff's version of facts, insofar as it is supported by the record"); *Serna v. Colo. Dept. of Corr.*, 455 F.3d 1146, 1150-51, 1155 (10th Cir. 2006) (reversing a district court's denial of summary judgment based on qualified immunity because plaintiff failed to present any evidence to support his allegations); *Blossom v. Yarbrough*, 429 F.3d 963, 967 (10th Cir. 2005) (suggesting a complete lack of evidence supporting a plaintiff's allegation may involve "a jurisdictionally permissible abstract question of law that may be resolved in a qualified immunity appeal").

On appeal, Blackwell points to evidence he argues supports an inference Officer Strain was motivated by a discriminatory purpose.  He first asserts his account of his experience at the POE is such evidence.  He alleged Officer Strain made him wait an inordinately long period of time before conducting the inspection of his vehicle; accused him of being under the influence of drugs or alcohol; administered a field sobriety test; told him he had a "problem," subjected

him to a subsequent unwarranted breathalyzer test; pressured him to sign the citation; and otherwise exhibited a disturbingly hostile, aggressive, unprofessional, and confrontational demeanor for no apparent reason. Contrary to Blackwell's assertions, however, this is not evidence from which a jury could reasonably infer Officer Strain was motivated by a racially discriminatory purpose. There is no indication Officer Strain behaved the way he did, even in part, because Blackwell is black. For all we know, Officer Strain behaves in this same manner toward all of the truckers he interacts with at the POE, regardless of their race. *See Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003) (stating that "the Johnsons have offered no evidence that Crooks does not stop non-African Americans under similar circumstances," but instead, "rely on Ms. Johnson's personal opinion that she was stopped on account of her race, plus additional aspects of the encounter that do not directly evidence racial animus"); *Gardenhire v. Shubert*, 205 F.3d 303, 320 (6th Cir. 2000) (concluding that plaintiff's evidence the officer gave them "condescending glares" and told them to "get out of town" did not indicate discriminatory purpose because, while the officer's "manners may not have conformed to Emily Post standards, there is no evidence that he was motivated by racial animus").

At oral argument, Blackwell's counsel emphasized that Officer Strain accused Blackwell of being under the influence of drugs or alcohol, administered a sobriety test, told Blackwell he had a "problem" after this test was administered,

and then performed an unwarranted breathalyzer test. The record shows, however, that Officer Strain asked Blackwell if he had been drinking or doing drugs, which Blackwell took as an accusation, and conducted the sobriety tests only after Officer Strain discovered the alcohol in Blackwell's vehicle. It is eminently reasonable for Officer Strain to pose these questions and administer sobriety tests after discovering Blackwell was transporting alcohol in his vehicle illegally. Nothing in the record suggests Officer Strain posed these questions or administered the sobriety tests even in part because of Blackwell's race. In sum, even viewing Blackwell's account of his encounter with Officer Strain in the light most favorable to Blackwell, it is not evidence from which a jury could reasonably infer Officer Strain was motivated by a racially discriminatory purpose.

Blackwell next points to evidence that several other black truck drivers felt they were discriminated against at the POE because of their race. Many of these accounts, however, alleged racial discrimination by MTD personnel at the POE as a whole rather than Officer Strain individually. As such, they are not evidence from which a jury could reasonable infer Officer Strain was motivated by a discriminatory purpose. Some of these accounts, however, do involve Officer Strain. One driver claimed that when he pulled up at the POE window, Strain said "I remember you," and told him to pull over. The driver alleged Officer Strain recognized him because Strain previously and unjustly gave him a speeding

ticket. The driver stated that he believed racial profiling was occurring at the POE and that he was profiled. Another trucker alleged that, during the inspection of his vehicle, he asked why Officer Strain was inspecting the inside of his trailer and Officer Strain became agitated. He claims Officer Strain then told him to stand in a certain spot while the trailer was searched and, when he did not move quickly enough, Officer Strain reached for his sidearm. He claimed Officer Strain then searched the cab, and again ordered him to stand in a certain spot. When he objected to the cab search, Officer Strain again reached for his sidearm. The driver asserted he has been driving for decades and never experienced anything like this. He claimed Officer Strain was not interested in safety, as he did not check for a secure load or safety equipment. He claimed he never had a Level II inspection last so long, felt violated by the search, and has since avoided the POE. Like Blackwell's account of his encounter with Officer Strain, nothing in these accounts suggests Officer Strain behaved toward these truckers as he did because they are black. *See Gardenhire*, 205 F.3d at 320. Moreover, there is no evidence that non-black truck drivers who were stopped, detained, and subjected to heightened inspections by Officer Strain were treated any differently from these truckers. *See Armstrong*, 517 U.S. at 470; *Johnson*, 326 F.3d at 1000; *James*, 257 F.3d at 1179. Like Blackwell, these truck drivers' allegations of racial discrimination are based on their personal opinions they were stopped, detained, subjected to a heightened inspection level, or treated badly by Officer Strain

because they are black. This is not evidence from which a jury could reasonably infer Officer Strain was motivated by a discriminatory purpose. *See Johnson*, 326 F.3d at 1000.

Finally, Blackwell points to evidence that state and federal narcotics agents and federal public defenders who handle cases originating from the POE noticed that persons arrested for possession with intent to distribute drugs at the POE have been almost exclusively black. Moreover, he claims, a Drug Enforcement Administration agent notified a POE supervisor that racial profiling was occurring at the POE and other narcotics agents commented to an MTD supervisor on the number of blacks arrested at the POE. Nevertheless, Blackwell asserts, the MTD failed to investigate whether racial profiling was occurring at the POE. As this court has already made clear, however, evidence concerning the POE as a whole, rather than Officer Strain individually, is not evidence from which a jury could reasonably infer Officer Strain was motivated by a discriminatory purpose.[5]

In sum, while Blackwell presented a generous amount of evidence regarding alleged discrimination at the POE as a whole, the evidence he presented regarding alleged discrimination by Officer Strain as an individual is entirely lacking. Other than the statistical evidence, which is insufficient standing alone to demonstrate discriminatory purpose, there is simply no evidence in the record

---

[5]We also note that much of this particular evidence appears to be hearsay, and, therefore, is likely inadmissible. Fed. R. Evid. 801-802.

-24-

from which a jury could reasonably infer Officer Strain was motivated by a discriminatory purpose when he stopped, detained, subjected to a heightened inspection level, or issued a citation to Blackwell on August 15, 2008.

## V.    Conclusion

Because Blackwell failed to present evidence from which a jury could reasonably infer Officer Strain was motivated by a discriminatory purpose Officer Strain is entitled to qualified immunity. We need not decide whether Blackwell presented evidence from which a jury could reasonably infer Officer Strain's actions had a discriminatory effect. This court **reverses** and **remands** to the district court with instructions to grant summary judgment to Officer Strain.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge

-25-

**No. 11-2078, Blackwell v. Strain**
Holloway, Circuit Judge, dissenting:

Because I am persuaded that the district judge decided the issues correctly and supported her decision amply in her Memorandum Opinion and Order, I would affirm her order denying summary judgment on grounds of qualified immunity to Defendant-Appellant Strain.

## I

The majority quotes the correct standards for our review of this interlocutory appeal but, in my view, fails to adhere to those standards. The majority notes that *"it is not our province to determine whether the record supports the district court's factual assumptions"* and that instead "we simply take, as given, the facts that the district court assumed when it denied summary judgment for a purely legal reason." Maj. op. at 5-6 (quoting *Bowling v. Rector*, 584 F.3d 956, 963 (10th Cir. 2009) (emphasis added)). The majority is also correct that where the district court has found that a reasonable jury could make certain findings based on the plaintiff's evidence, "we usually must take them as true – and do so even if our own *de novo* review of the record might suggest otherwise as a matter of law." Maj. op. at 18 (quoting *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010)).

But the majority proceeds to undertake exactly the examination of the district court's factual assumptions that it purports to eschew and that binding precedent forbids. Noting that our review is limited to "neat [,] abstract issues of

law," as *Johnson v. Jones* requires and as we have since recognized numerous times, the majority makes no attempt to identify such an issue in this case, and understandably so because there is no such issue.

The only exception to the principle that we simply accept the district court's findings of fact applies only in that rare case in which the district court's view of the facts is "blatantly contradicted by the record." *Id.* (quoting *Lewis*, which in turn was quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). But nowhere in the majority's opinion is any finding or factual assumption shown to be "blatantly contradicted by the record." Instead, the majority proceeds to do just what it said we should not, scouring the record *de novo* to determine whether the record supports the district court's factual findings. It may be helpful to remember the reasons underlying the principle that we take the district court's findings and assumptions of fact as true "even if our own *de novo* review of the record might suggest otherwise as a matter of law."

The reasons were set out in a unanimous opinion from the Supreme Court, *Johnson v. Jones*, 515 U.S. 304 (1995). There the Court noted that

> the issue here at stake – the existence, or nonexistence, of a triable issue of fact – is the kind of issue that trial judges, not appellate judges, confront almost daily. Institutionally speaking, appellate judges enjoy no comparative expertise in such matters. And, to that extent, interlocutory appeals are less likely to bring important error-correcting benefits here than where purely legal matters are at issue . . . .

> For another thing, questions about whether or not a record demonstrates a "genuine" issue of fact for trial, if appealable, can consume inordinate amounts of appellate time. Many constitutional tort cases, unlike the simple "we didn't do it" case before us, involve factual controversies about, for example, intent – controversies that, before trial, may seem nebulous.

*Id.* at 316 (internal citations omitted).

The majority, however, in direct contradiction of the standard of review it expressly recognizes, proceeds to reverse the district court in this case "[b]ecause the record is devoid of any evidence that supports" inferences drawn by the district court. Maj. op. at 19. As I will show below, the majority errs in its reading of the record, which does include evidence to support the district court's inferences. But the larger point is that undertaking this review of the record is "not our province." *Bowling*, 584 F.3d at 963.

The majority cites *Scott v. Harris*, 550 U.S. 372, as authority for its stark departure from over fifteen years of decisions in the wake of *Johnson v. Jones*. *Scott v. Harris*, however, stands only for the proposition, as already quoted, that the reviewing court may, in unusual circumstances such as those present in that case, determine if the district court's view of the evidence is "blatantly contradicted by the record." The majority also quotes *Scott*'s unremarkable statement that at the summary judgment stage, courts "draw all inferences in favor of the nonmoving party *to the extent supportable by the record . . . .*" Maj. op. at 19. But *Scott* simply does not overrule or abrogate the holding of *Johnson*

*v. Jones* that *it is for the district court to make the determination of what is supported by the record.*

We recognized this when we said, after *Scott*, that we "consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment" and that "[i]t is not the job of the appellate court to determine whether the record supports the district court's factual assumptions." *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301 (10th Cir. 2009) (internal citation omitted). As already noted, we said the same thing in *Rector*, and the majority actually quotes this principle before proceeding in contravention of it.

Similarly, we have described the holding of *Scott* as applying only "in the most limited of circumstances." *Mascorro v. Billings*, 656 F.3d 1198, 1202, n.1 (10th Cir. 2011). We noted that the exceptional circumstances in *Scott* involved the existence in the record of a videotape that "clearly contradicted" the plaintiff's version of events. We went on to say that we "will not hear an appeal when the question is the sufficiency of the evidence or the correctness of the district court's findings with respect to a genuine issue of material fact." *Id.* at 1204, n.6.

In addition to relying on the inapposite holding of *Scott v. Harris*, the majority also cites three of our cases as purportedly supporting its marked departure from precedent and making it our province to determine whether the

-4-

record supports the district court's factual assumptions. The third of these, *Blossom v. Yarbrough*, 429 F.3d 963, 967 (10th Cir. 2005), as the majority notes, merely suggests that there might be some cases where a reviewing court could depart from the usual principle. Thus, it is no authority for ignoring the well established limits of our review in interlocutory appeals. The majority also cites *Serna v. Colorado Dept. of Corrections*, 455 F.3d 1146, 1150-51 (10th Cir. 2009), and *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009). To the extent that *Serna* and *Thomson* do hold that we can review the evidence *de novo* to see if the district court's findings are supported by the record, I would recognize that those cases are contrary to *Johnson v. Jones* and numerous cases from our court and so not binding on us here.

In sum, this interlocutory appeal involves no neat, abstract issue of law, and the majority does not even attempt to identify such an issue. The district court found that the evidence submitted on summary judgment was sufficient for a reasonable jury to infer that Defendant violated Plaintiff's constitutional rights. We have no jurisdiction to review that holding. The majority's detailed and thorough (but flawed) examination of the record is in contravention of the well established limits of our jurisdiction here. I must dissent from this approach.

## II

Even if our limited jurisdiction in this interlocutory appeal were to include the *de novo* review of the evidence underlying the district court's determinations

– which it most certainly does not, as I have explained – I would still be unable to agree with the majority's holding because the majority makes another error in its evidentiary review. The majority (at pp. 15-16) rejects Plaintiff's evidence that Defendant Strain subjected other African-American truck drivers to intrusive inspections on the same day that he was detained at the Port of Entry, deeming this evidence to be statistical evidence that is too weak to be reliable because of a small sample size. That legal principle, however, does not apply to this evidence, which is not merely statistical evidence.

When faced with a claim of discriminatory enforcement practices by an individual officer, we have described similar evidence as seeking to prove the plaintiff's case *"not by means of statistical inference but by direct evidence* of [the officer's] behavior during the events in question, . . . and [the officer's] alleged *record of racially selective stops and arrests in drug cases under similar circumstances . . . ." Marshall v. Columbia Lea Regional Hospital*, 345 F.3d 1157, 1168 (10th Cir. 2003) (emphasis added).[1] The majority's rejection of Mr. Blackwell's evidence is contrary to the holding of that case.

## Conclusion

Because binding precedent does not permit us to rule on the sufficiency of the evidence supporting the district court's factual findings and the inferences

---

[1]I note that Defendant does not assert that the evidence of his own actions should have been disregarded as statistical evidence based on a sample of insufficient size. *See* Appellant's Reply Brief at 16-17.

reasonably drawn therefrom, I dissent from the majority's view of the boundaries of our jurisdiction. I am further convinced that the majority errs in disregarding evidence of Defendant's behavior with other African-American drivers at the relevant time.

Accordingly, I respectfully dissent.